**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Michael Kelly ROBINSON,**
**Defendant-Appellant.**

No. 79-5252.

United States Court of Appeals,
Fifth Circuit.

Sept. 17, 1980.

---

Stephen A. Kermish, Atlanta, Ga., for defendant-appellant.

William S. Sutton, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before BROWN, HILL and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

This is an appeal from a conviction in a nonjury trial for possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Appellant Robinson moved to suppress the introduction at trial of the cocaine on the ground that it had been seized at the Atlanta Hartsfield International Airport by agents of the Drug Enforcement Administration (DEA) in violation of his fourth amendment rights. After a hearing, the magistrate recommended that the motion to suppress be denied, and the district court adopted the magistrate's findings and recommendation without a hearing. Robinson waived jury trial and was tried and found guilty on stipulated facts. This appeal followed.

*Facts and Proceedings Below*

The hearing before the magistrate on the motion to suppress the cocaine focused on the manner in which the cocaine had been obtained from Robinson by the DEA agents. On the basis of the testimony presented at the hearing, the magistrate made the following findings of fact with respect to the seizure of the cocaine:

1. On September 21, 1978, DEA Agent[s] Paul Markonni and Michael L. Dorsett were on duty at the Atlanta Airport observing passengers at the arrival gate of Flight 1122, a non-stop flight from Miami, Florida.

2. At approximately 3:15 p. m., Agent Markonni's attention became focused upon [Robinson] when Agent Dorsett informed him that [Robinson] had exited from the doorway leading from the airplane, and that he stared directly at the two DEA Agents, appeared to be nervous and perspiring, and was looking around the arrival area unlike the other passengers.

3. Agent Markonni first saw [Robinson] while he was walking up Concourse "F" towards the main terminal, carrying only a standard size briefcase, and then observed him turn around several seconds later and return to the Delta gate agent to ask about his connecting flight to Birmingham, Alabama.

4. After receiving directions for his Birmingham flight, [Robinson] walked up the concourse 10 or 11 feet, and then turned and stared directly at Markonni. He then walked further up the concourse, only to again pause and stare at Markonni, and then proceeded to Gate 61 and not Gate 53, the proper gate for his Birmingham flight which was 50–60 feet further up the concourse, and around the corner.

5. Agent Markonni secreted himself behind the desk at Gate 53, and observed [Robinson] speak to the gate agent and then walk slowly in the area of the connector to the main terminal.

6. [Robinson] reached the area of the security checkpoint area of the main terminal, stopped, and returned back to the concourse, appearing to hesitate going down the stairs adjacent to the security checkpoint.

7. Agent Markonni then walked up beside [Robinson] and was able to observe [Robinson's] airplane ticket that he carried strapped to his briefcase and he noticed no baggage claim tickets attached to the airplane ticket.

8. Agent Markonni then identified himself as a federal officer to [Robinson], showed him his credentials, and asked whether he could see his airline ticket.

9. [Robinson] gave Markonni his ticket as requested, which revealed that it was issued in the name Michael Reilly, which [Robinson] explained by saying he had borrowed the ticket. [Robinson] also produced a driver's license in the name of Michael Robinson.

10. [Robinson] denied to Agent Markonni that he was carrying narcotics, and further consented to Markonni's request that he permit a brief search of his person and briefcase.

11. Markonni then asked whether [Robinson] would accompany him to a downstairs office (not identified as the police precinct office), so as to avoid the public observing the search, to which [Robinson] also agreed, and in addition, [Robinson] placed his briefcase on a table, and asked whether Markonni wished to search it.

12. Markonni deferred searching the briefcase at this point, and instead proceeded with [Robinson] to the downstairs precinct office approximately 125 feet, or 3 minutes away from the point of the initial stop.

13. Upon reaching the precinct office, Officer E. W. White accompanied Markonni and [Robinson] to an adjacent office at Markonni's request.

14. [Robinson] was again requested to allow a search of his person and personal property, and was read the following from a card carried by Markonni:

> You have the right to allow or refuse to allow a search to be made of your person and personal property that you have with you. Do you understand?

15. [Robinson] replied that he understood his rights and consented to the search.

16. Markonni's initial patdown search of [Robinson] revealed nothing unusual, nor did his subsequent search of [Robinson's] briefcase.

17. Markonni's suspicions regarding [Robinson] persisted, and he again searched [Robinson's] person, this time noticing something unusual beneath [Robinson's] clothing, in the area of his lower abdomen.

18. At no time during the search did [Robinson] indicate a desire to discontinue the search, nor was he ever told he was under arrest, or prohibited from leaving or coerced into consenting to be searched.

19. [Robinson] was then told to drop his trousers, and Markonni further satisfied himself that there was something unusual inside a blue and white paraplegic diaper worn by [Robinson], which was recovered by Markonni and was revealed to be a package of cocaine wrapped in tape. [Robinson] was then placed under arrest.

Record on Appeal, Vol. 1, at 17–19 (citations to hearing transcript omitted).

The magistrate made four findings with respect to the legality of the seizure of the cocaine. First, relying on *United States v. Ballard*, 573 F.2d 913 (5th Cir. 1978), a case in which an initial encounter between DEA agents and a defendant similar to the initial encounter in this case was assumed to be an investigatory (*Terry*)[1] stop requiring reasonable suspicion, the magistrate treated the initial encounter between Markonni and Robinson as a *Terry* stop. Second, the magistrate determined that the three facts known to Markonni at the time of the investigatory stop which matched elements of the "drug courier profile"[2]—(1) Robinson's nervousness, (2) his arrival from a major drug distribution center, and (3) his lack of luggage other than a briefcase—were insufficient to justify a reasonable suspicion of criminal activity. Therefore, the magistrate held that the investigatory stop was violative of the fourth amendment. Third, the magistrate found that Robinson voluntarily consented to accompany Markonni to the precinct office in the airport and that he voluntarily consented to the search. Fourth, the magistrate found that Robinson's voluntary consent to the search, which was given after he was warned concerning

his fourth amendment rights, removed the taint of the illegal stop. Therefore, the magistrate concluded that the cocaine was admissible at trial.

On appeal, Robinson argues that the magistrate erred in its determination that his consent was voluntary and that the consent removed the taint of the illegal stop. On the other hand, the Government contends that the district court erroneously concluded that the initial encounter was a *Terry* stop requiring reasonable suspicion and that, even if the initial encounter was a *Terry* stop, it was supported by a reasonable suspicion of criminal activity.

Thus, we are faced with four issues in this case: (1) whether and when a seizure within the meaning of the fourth amendment occurred; (2) if a seizure occurred, whether reasonable suspicion existed at the time of the seizure; (3) whether Robinson voluntarily consented (a) to accompany Markonni to the precinct office in the airport, and (b) to the search; and (4) if Robinson voluntarily consented but the seizure, if any, was illegal, whether the search was the tainted product of the illegal seizure.

On October 1, 1979, the Supreme Court granted the petition for certiorari in *United States v. Mendenhall*, 444 U.S. 822, 100 S.Ct. 42, 62 L.Ed.2d 29 (1979), a "drug courier profile" case involving issues similar to those presented by the case before us. After hearing oral argument in this case in Atlanta, Georgia on November 29, 1979, we decided to delay disposition of this appeal pending the Court's action in *Mendenhall*. The Court's decision in *Mendenhall* was announced on May 27, 1980. —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497. As we will explain below, the majority opinion in *Mendenhall* is, in our view, dispositive of only one of the four issues in this case—the voluntary consent issue. Soon after its decision in *Mendenhall*, the Court decided a second case involving the "drug courier pro-

---

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

2. The "drug courier profile" is "an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs." *Unit-*

*ed States v. Mendenhall*, —— U.S. ——, ——, 100 S.Ct. 1870, 1873, 64 L.Ed.2d 497 (1980). For a listing of the characteristics on the profile, see *United States v. Ballard*, 573 F.2d 913, 914 (5th Cir. 1978).

file," *Reid v. Georgia,* —— U.S. ——, 100 S.Ct. 2752, 65 L.Ed.2d —— (1980) (per curiam). After carefully studying *Mendenhall* and *Reid,* and after considering supplemental briefs submitted by the parties, we have determined that the case must be remanded to the district court for factual and legal findings with respect to three of the four issues raised on appeal. For purposes of clarity, we will separately discuss each of the issues on appeal and the reasons for our disposition of each issue.

### Seizure

The threshold question in this case is whether and when a "seizure" within the meaning of the fourth amendment occurred. Relying on *United States v. Ballard,* 573 F.2d 913 (5th Cir. 1978), the magistrate assumed that Robinson was "seized"—and thus, reasonable suspicion was required—at the moment Markonni originally approached Robinson and began asking him questions.

The Government, citing *United States v. Elmore,* 595 F.2d 1036 (5th Cir. 1979), a post-*Ballard* "drug courier profile" case decided by our Circuit after the magistrate made his findings in this case, contends that the initial encounter between Markonni and Robinson was "merely a police-citizen contact" falling outside the scope of the fourth amendment. Because the Supreme Court has not addressed the proper standard for determining when a "seizure" within the meaning of the fourth amendment has occurred, *we agree that we are bound by Elmore,* which is the controlling law on the issue in this Circuit.

In *Mendenhall,* a majority of the Supreme Court held that heroin seized from Mendenhall by DEA agents at the Detroit Airport was admissible at trial in that her fourth amendment rights were not violated. The threshold question in that case was whether she had been seized in violation of her fourth amendment rights. Justice Stewart delivered the opinion of the Court, but with respect to this threshold issue, only Justice Rehnquist joined his opinion. In Justice Stewart's view, Mendenhall was not "seized" within the meaning of the fourth amendment when the agents approached her on the airport concourse and asked her questions. According to Justices Stewart and Rehnquist, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." —— U.S. at ——, 100 S.Ct. at 1877. On the facts presented, Justices Stewart and Rehnquist concluded that Mendenhall did not have any objective reason to believe that she was not free to go. On the other hand, Justice Powell, joined by Chief Justice Burger and Justice Blackmun, answered the threshold question by concluding that even if the stop constituted a "seizure," the stop was not violative of the fourth amendment since the agents had a reasonable suspicion that Mendenhall was engaging in criminal activity. Thus, they did not view the issue whether Mendenhall was "seized" within the meaning of the fourth amendment as necessary to a decision of the case and declined to reach it.[3] Therefore, although a majority[4] of the Court, via two separate forms of analysis, concluded that the agents' initial contact with Mendenhall did not violate her fourth amendment rights, since neither form of analysis commanded a majority of the Court, the views expressed by the majority Justices in the two plurality opinions do not constitute binding precedent.

In *Reid,* the Supreme Court held that a DEA agent acted illegally when he stopped and questioned Reid on the basis of infor-

---

3. Justice Powell's concurring opinion expressly stated that his decision not to reach the seizure issue did not necessarily indicate disagreement with Justice Stewart's views on that issue. In his opinion, "the question whether [Mendenhall] reasonably could have thought she was free to 'walk away' when asked by two govern-

ment agents for her driver's license and ticket" was "extremely close." —— U.S. at ——, 100 S.Ct. at 1880 n. 1.

4. Justices White, Brennan, Marshall and Stevens concluded that Mendenhall had been seized unlawfully.

mation that was insufficient to justify a reasonable suspicion of criminal activity. Because the issue whether the initial contact between the agent and Reid constituted a fourth amendment "seizure" was not raised in the courts below and was, therefore, not treated by the Court, the proper standard for determining when a fourth amendment "seizure" has occurred remains an open question. Therefore, we are bound by the standard adopted by our Circuit in *Elmore.*

In *Elmore,* this Circuit held that, even though a DEA agent approached Elmore, identified himself as a federal narcotics agent, asked to see Elmore's airplane ticket and asked him questions, no "seizure" within the meaning of the fourth amendment occurred until Elmore's airplane ticket was removed from his immediate presence. Although the *Elmore* court did not explicitly set out the proper standard for determining when a "seizure" has occurred, it appears that the court adopted the same objective test delineated in *Mendenhall* by Justices Stewart and Rehnquist—whether, under the totality of the circumstances, a reasonable person would have thought he was not free to leave. On the facts before it, the *Elmore* court held that since the initial encounter was not precipitated by force, there was no physical contact, the only show of authority occurred when the agents initially approached Elmore and identified themselves as law enforcement officers, and the tone of the conversation and events indicated that Elmore was not compelled to continue the encounter, there was no "seizure" within the meaning of the fourth amendment until Markonni removed Elmore's airplane ticket from the immediate area.[5]

The central problem that confronts us with respect to application of the *Elmore* test to the facts of this case is that, because the magistrate relied on pre-*Elmore* case law, the hearing on the motion to suppress did not focus on the question whether, under all the circumstances, a reasonable person would have believed he was not free to leave and, consequently, no factual or legal findings on that issue were made. In the absence of a dispute about the facts surrounding the initial encounter, we might be able to apply the appropriate legal standard to the facts and determine whether and when a "seizure" occurred. This, however, is not such a case, for there is a dispute in this case concerning at least one potentially dispositive factual distinction between this case and *Elmore.*

At the hearing on the motion to suppress, only Markonni and Robinson testified. The crux of Markonni's testimony was that, based on certain suspicious characteristics exhibited by Robinson, he walked up behind and beside Robinson, identified himself and requested identification from Robinson. According to Markonni, Robinson handed him his plane ticket, which was issued in the name of Michael Reilly. Robinson explained by saying he had borrowed the ticket, and produced a driver's license in the name of Michael Robinson. According to Markonni, Robinson was then asked whether he was carrying narcotics, which he denied, and subsequently Robinson consented to a search. Robinson's testimony, however, differs in at least one important respect from that of Markonni, for Robinson described the initial encounter as follows:

> I first noticed [Markonni] when he came up beside me from behind me. He came up beside me, touched my arm, and showed me his identification, like he said, and asked for my plane ticket and said that he was conducting a narcotics investigation *and he had reason to believe that I was carrying narcotics.*

Record on Appeal, Vol. 2, at 51 (emphasis added). Robinson argues that the fact that Markonni in effect accused him of carrying drugs distinguishes this case from *Elmore.* He contends that no reasonable person would feel free to go after being accused by a police officer of carrying narcotics.

Although we intimate no view with respect to whether a police officer's statement

---

The court specifically refused to find that the police officers' identification of themselves to

Elmore was a sufficient show of authority to convert the encounter into a "seizure."

to a suspect that he has reason to believe the suspect is carrying drugs would justify a reasonable person in believing that he was not free to go, we think that such a statement would, at minimum, be a significant factor in the *Elmore* analysis.[6] The magistrate, however, made no finding with respect to whether or when Markonni actually made the statement. Thus we are left with a situation in which, in order to evaluate the initial encounter in this case under the *Elmore* test, we would be required to decide for ourselves both if and when Markonni told Robinson that he "had reason to believe" that Robinson was carrying narcotics. Because we are in no position to make credibility judgments on the basis of a cold and incomplete record, we are of the view that a remand is required.

On remand, the district court should hold a new hearing on the motion to suppress, which should focus on the circumstances surrounding the initial encounter. The district court should make factual findings, paying particular attention to the question whether and when Markonni told Robinson that he had reason to believe Robinson was carrying narcotics. On the basis of the facts elicited at the hearing, the district court should then make a legal finding under the *Elmore* standard on the issue whether and when a "seizure" occurred. When those findings are made, we will then be able adequately to review the district court's determination.[7]

### Reasonable Suspicion

Because the question whether a seizure was supported by a reasonable suspicion of criminal activity requires an evaluation of the articulable facts known to the police officer "at the moment of the seizure," *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880, the

precise time at which the seizure occurred must be pinpointed. Facts which become known to the police officer after the seizure cannot be used to justify it.

As explained above, the magistrate assumed that a seizure occurred when Markonni initially approached Robinson. Thus, in determining that no reasonable suspicion existed for the seizure, the magistrate considered only those facts known to Markonni at the time of the initial encounter: (1) Robinson's nervousness, (2) his arrival from a major drug distribution center, and (3) his lack of luggage other than a briefcase. Because we are remanding the seizure issue for reconsideration of whether and when a seizure occurred in light of *Elmore*, we recognize that the district court may determine that a seizure did not occur or occurred sometime subsequent to the initial encounter. Since the record reveals that Markonni acquired at least one more item of information after the initial encounter— that Robinson's airplane ticket was issued in the name of Michael Reilly—we think that the issue whether a reasonable suspicion existed at the time of the seizure should be reevaluated by the district court in light of its determination with respect to when the seizure occurred.

In reevaluating the reasonable suspicion issue, the district court should pay particular attention to the Supreme Court's decision in *Reid v. Georgia*, —— U.S. ——, 100 S.Ct. 2752, 65 L.Ed.2d ——, which constitutes the Court's first authoritative holding with respect to the quantum of information necessary to support a reasonable suspicion of criminal activity in the context of the "drug courier profile." In addition, the district court may find recent "drug courier

---

6. We stated in *Elmore* that the question whether a seizure has occurred "often requires a 'refined judgment,' especially when no force, physical restraint, or blatant show of authority is involved." 595 F.2d at 1041–42 (footnote omitted), quoting *United States v. Wylie*, 569 F.2d 62, 68 (D.C.Cir. 1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978).

7. We have held that a remand to the district court is proper where the necessary findings were not made by the district court, or review is hampered because the record is ambiguous due to inadequate development of the critical facts. *See United States v. Wilson*, 569 F.2d 392, 397 (5th Cir. 1978); *Logan v. Capps*, 525 F.2d 937 (5th Cir. 1976); *United States v. Impson*, 482 F.2d 197 (5th Cir.), *cert. denied*, 414 U.S. 1009, 94 S.Ct. 371, 38 L.Ed.2d 246 (1973).

profile" cases from this [8] and other [9] circuits helpful, to the extent that they are consistent with *Reid*, in analyzing the reasonable suspicion issue.

### Consent

 Unlike the two issues discussed above, the magistrate's determination that Robinson voluntarily consented to accompany Markonni to the police precinct office and that he voluntarily consented to the search can be reviewed without the necessity of a remand. Robinson first argues that Markonni's request for Robinson to accompany him to the airport precinct office converted the encounter into an arrest requiring probable cause. In *Mendenhall*, however, a majority of the Supreme Court rejected that identical contention. There, the Court held that, so long as Mendenhall's consent to accompany the agents was in fact voluntary—that is, not "the product of duress or coercion, express or implied," —— U.S. at ——, 100 S.Ct. at 1879, the agents' request for Mendenhall to accompany them to the airport DEA office did not amount to an arrest requiring probable cause. Therefore, under *Mendenhall*, all that is required in order to validate Markonni's request for Robinson to accompany him to the precinct office is Robinson's voluntary consent.

 Robinson next contends that his consent to accompany Markonni was not voluntary. We have no trouble in disposing of that contention. The question of voluntariness is one of fact to be determined from the totality of the circumstances, *Mendenhall*, —— U.S. at ——, 100 S.Ct. at 1879,

and the trial court's voluntariness determination must not be reversed on appeal unless clearly erroneous, *United States v. Troutman*, 590 F.2d 604, 606 (5th Cir. 1979). After reviewing the record, we are convinced that the magistrate's conclusion that Robinson's consent to accompany Markonni was voluntary is not clearly erroneous. As in *Mendenhall*, Robinson "was not told that [he] had to go to the office, but was simply asked if he would accompany the officer[]. There were neither threats nor any show of force. [Robinson] had been questioned only briefly, and [his] ticket and identification were returned to [him] before [he] was asked to accompany the officers." —— U.S. at ——, 100 S.Ct. at 1879. Therefore, we affirm the magistrate's finding that Robinson's consent to accompany Markonni to the airport police precinct office was voluntary.

Likewise, we do not hesitate to conclude that Robinson voluntarily consented to the search of his person. As the magistrate noted, the record reveals that Robinson is a college graduate who had earned fifteen quarter hours toward a Master's degree and was, like the petitioner in *Mendenhall*, "plainly capable of a knowing consent." —— U.S. at ——, 100 S.Ct. at 1879. Further, Robinson was expressly warned that he was free to decline to consent to the search. Although such a warning is not required in order to validate a consent to a search, *Mendenhall*, —— U.S. at ——, 100 S.Ct. at 1879; *Schneckloth v. Bustamonte*, 412 U.S. 218, 234, 93 S.Ct. 2041, 2051, 36 L.Ed.2d 854 (1973), knowledge is highly relevant in the voluntariness determination.[10]

---

**8.** *See United States v. Roundtree*, 596 F.2d 672 (5th Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 149, 62 L.Ed.2d 96 (1979); *United States v. Ballard*, 573 F.2d 913 (5th Cir. 1978).

**9.** *See, e. g., United States v. Deggendorf*, 626 F.2d 47 No. 79–1974 (8th Cir. July 1, 1980); *United States v. Forero-Rincon*, 626 F.2d 218, (8th Cir. 1980); *United States v. Buenaventura-Ariza*, 615 F.2d 29 (2d Cir. 1980); *United States v. Vasquez*, 612 F.2d 1338 (2d Cir. 1979); *United States v. Vasquez-Santiago*, 602 F.2d 1069 (2d Cir. 1979); *United States v. Andrews*, 600 F.2d 563 (6th Cir.), *cert. denied*, 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979); *United States v. Price*, 599 F.2d 494

(2d Cir. 1979); *United States v. Rico*, 594 F.2d 320 (2d Cir. 1979); *United States v. Smith*, 574 F.2d 882 (6th Cir. 1978); *United States v. Chatman*, 573 F.2d 565 (9th Cir. 1977); *United States v. Pope*, 561 F.2d 663 (6th Cir. 1977); *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977); *United States v. McCaleb*, 552 F.2d 717 (6th Cir. 1977); *United States v. Scott*, 545 F.2d 38 (8th Cir. 1976), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 784 (1977).

**10.** Robinson argues that his consent to the search was involuntary because he was not given *Miranda* warnings. We reject that contention, for we have held that *Miranda* warnings are not a prerequisite to a finding that

Finally, though Robinson argues that he was under the objective impression that he would be searched in any event, and, thus, he felt that he was not free to go, we agree with the magistrate that, even if the initial encounter between Markonni and Robinson constituted an illegal seizure, there is no indication that Robinson was ever restrained, coerced or intimated into giving his consent to be searched.[11] Though Robinson's subjective feelings are relevant as part of the "totality of circumstances," they are not sufficient to render the magistrate's voluntariness determination clearly erroneous.[12] Thus, we affirm the magistrate's finding that Robinson's consent to the search was voluntarily given.

### Fruit of the Poisonous Tree

Though Robinson's consent to the search was voluntary in the sense that it was not coerced or brought about by duress, the question remains whether, assuming that the initial encounter constituted an illegal seizure,[13] the connection between the illegality and the consent to search was sufficiently attenuated to permit the use of the cocaine obtained from the search at trial. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The magistrate determined that Robinson's voluntary consent to the search, which was given after he was warned of his fourth amendment right to refuse to allow the search, removed the taint of the illegal stop. We have concluded that this issue,

like the first two issues in the case, must be remanded for reconsideration by the district court, for the magistrate used an improper legal analysis in concluding that the taint of the illegal seizure was dissipated by Robinson's voluntary consent to the search.

The Supreme Court has made it absolutely clear that, in order for a confession given after an illegal seizure to be admissible in evidence, the government must prove two things: that the confession is voluntary for purposes of the fifth amendment, and that the confession was not the product of the illegal seizure. *Dunaway v. New York*, 442 U.S. 200, 216–220, 99 S.Ct. 2248, 2258–60, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The second requirement focuses on causation: " '[w]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint,' " *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417 (citation omitted). While there is some overlap in the two tests, *see generally* 2 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment 650 (1978), the two requirements are distinct and independent. We have held that the same requirements apply where the evidence has been obtained by means of a consent to search rather than a confession. *See United States v. Wilson*, 569 F.2d 392 (5th Cir. 1978).

consent to search was voluntarily given. *United States v. Tobin*, 576 F.2d 687, 693 (5th Cir.), *cert. denied*, 439 U.S. 1051, 99 S.Ct. 731 (1978); *United States v. Garcia*, 496 F.2d 670, 674–75 (5th Cir. 1974), *cert. denied*, 420 U.S. 960, 95 S.Ct. 1347, 43 L.Ed.2d 436 (1975).

**11.** The magistrate appears to have discounted Robinson's testimony that Markonni told Robinson that Markonni would "need to" conduct a search, and we will not disturb that credibility finding. *See United States v. Troutman*, 590 F.2d at 606. Therefore, we do not address the question whether such a statement would render a consent to search involuntary.

**12.** Robinson argues that he could not have acted voluntarily because, while denying his guilt, he consented to a search he knew would disclose the cocaine. This contention was reject-

ed in *Mendenhall*. As the Court stated, "the question is not whether [Robinson] acted in [his] ultimate self-interest, but whether [he] acted voluntarily." —— U.S. at ——, 100 S.Ct. at 1880.

**13.** We recognize that, on remand, the district court may find that no "seizure" occurred or that, if it occurred, it was lawful, which would obviate the necessity for considering whether the cocaine was the product of an unlawful seizure. Nevertheless, because the district court may find that an unlawful seizure occurred, we deem it necessary, in the interest of judicial economy, to reach the issue whether the consent to search was tainted. Therefore, we assume for purposes of this discussion that an unlawful seizure occurred.

In *Brown v. Illinois*, the Supreme Court delineated three factors to be considered in determining whether the voluntary consent was obtained by exploitation of the illegal seizure: "[t]he temporal proximity of the [seizure] and [the consent], the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct . . . ." 422 U.S. at 603–04, 95 S.Ct. at 2261. Last year, in *Dunaway v. New York*, 442 U.S. 200, 217–220, 99 S.Ct. 2248, 2259–60, 60 L.Ed.2d 824 (1979), the Supreme Court noted the continuing vitality of the *Brown* analysis. In addition, *Dunaway* reaffirmed *Brown's* holding that *Miranda* warnings do not, without more, dissipate the taint of an illegal seizure. *Id.* 99 S.Ct. at 2258–60.

The magistrate did not apply the *Brown* factors to the facts of this case; rather, he merely satisfied himself that Robinson's consent to the search was voluntary. He stated:

> This Circuit has previously held that a voluntary consent to a search will remove the taint of an illegal arrest. *United States v. Wilson*, 569 F.2d 392 (5th Cir. 1978). Similarly, advising a defendant of his right to refuse his consent to a search constitutes a sufficient intervening factor to remove the taint of a prior Fourth Amendment violation. *United States v. Fike*, 449 F.2d 191 (5th Cir. 1971) . . .

Record on Appeal, Vol. 1, at 21. After discussing the indicia of *voluntariness* surrounding the consent, the magistrate stated that "this court is confident in concluding that [Robinson's] consent to be searched was voluntarily given, *thereby removing*

the taint of the unwarranted investigatory stop." *Id.* at 22 (emphasis added).

In light of the principles delineated by the Supreme Court in *Brown* and *Dunaway*, it is clear to us that the magistrate applied an incorrect legal standard in judging the admissibility of the cocaine. The magistrate's statement that fourth amendment warnings attenuate the taint of an illegal seizure is in direct conflict with the holding of *Brown*. In addition, the magistrate's opinion demonstrates the same "lingering confusion between 'voluntariness' . . . and the 'causal connection' test established in *Brown*," *Dunaway*, 442 U.S. at 217–220, 99 S.Ct. at 2259–60, which characterized the lower court's opinion in *Dunaway*. Contrary to the magistrate's apparent view of the law,[14] a voluntary consent to search does not remove the taint of an illegal seizure. Rather, voluntariness is merely a threshold requirement. The "causal connection" between the illegal seizure and the consent to search must be independently examined, utilizing the factors set out in *Brown* in light of the policies to be served by the fourth amendment exclusionary rule. Because the magistrate failed to apply the "causal connection" test in this case, Robinson was deprived of the protection the test was designed to afford. Since it is the district court's duty to make findings of fact in the first instance on the attenuation issue, *see United States v. Wilson*, 569 F.2d at 397, we must remand this issue to the district court for complete findings and conclusions under the appropriate legal standard.[15]

### Conclusion

In summary, we affirm the determination of the magistrate, adopted by the district

---

14. Confusion with respect to the distinction between the voluntariness and "causal connection" tests is not uncommon. Indeed, while this Circuit has often recognized the distinction and the need for proof of both voluntariness and attenuation, *see, e. g., United States v. Wilson*, 569 F.2d 392 (5th Cir. 1978); *Logan v. Capps*, 525 F.2d 937 (5th Cir. 1976); *Phelper v. Decker*, 401 F.2d 232 (5th Cir. 1968), some of our pre-*Brown* opinions merged the tests, *see, e. g. United States v. Fike*, 449 F.2d 191 (5th Cir. 1971); *Bretti v. Wainwright*, 439 F.2d 1042 (5th Cir.), *cert. denied*, 404 U.S. 943, 92 S.Ct.

293, 30 L.Ed.2d 257 (1971), and at least one recent opinion ignored the "causal connection" test altogether, applying only the voluntariness test, *see United States v. Troutman*, 590 F.2d 604 (5th Cir. 1979).

15. We note that this Circuit followed the same course in *Logan v. Capps*, 525 F.2d 937 (5th Cir. 1976), a case in which confusion with respect to the distinction between voluntariness and attenuation resulted in the lower courts' failure to apply the "causal connection" test.

court, that Robinson voluntarily consented to accompany Markonni to the airport police precinct office and that he consented to the search. We vacate the conviction, however, and remand the case to the district court for a new suppression hearing and for findings of fact and conclusions of law on the three remaining issues in the case: (1) whether and when a "seizure" within the meaning of the fourth amendment occurred; (2) if a seizure occurred, whether reasonable suspicion existed at the time of the seizure; and (3) whether the search was the tainted product of an illegal seizure.

If the district court finds Markonni "seized" Robinson without a reasonable suspicion of criminal activity and that Robinson's consent to search was tainted by the illegal seizure, it must suppress the evidence and discharge the defendant. If it finds that the seizure, if any, was lawful, or that the consent to search was not tainted, the original sentence must be reinstated.

The judgment of the district court is vacated and the cause remanded to allow further proceedings consistent with this opinion.

VACATED and REMANDED.