**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Edward KELLY, Defendant–Appellee.**

**No. 88–5970.**

United States Court of Appeals,
Sixth Circuit.

Argued March 24, 1989.

Decided Sept. 11, 1990.

---

W. Hickman Ewing, Jr., U.S. Atty., Timothy R. DiScenza, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Memphis, Tenn., for plaintiff-appellant.

Edward Witt Chandler (argued), Memphis, Tenn., for defendant-appellee.

Before MERRITT, Chief Judge, BOGGS, Circuit Judge, and CONTIE, Senior Circuit Judge.

BOGGS, Circuit Judge.

The United States appeals the district court's order suppressing evidence seized in this airport drug search case. The district court found that Kelly gave consent to a search of his bag. However, independent of the search of the bag, Kelly was improperly searched and arrested before the search of the bag was carried out. For these reasons, the district court held that the consent was revoked as a matter of law. We reverse and remand for a factual inquiry into whether the consent was ever actually revoked.

I

On April 28, 1988, appellee Edward Kelly was observed by Sheriff's Department officers Forrest Roberts and Beverly Archer, who were assigned to the Airport Drug Task Force at Memphis International Airport. Kelly was disembarking from an airplane arriving from Los Angeles. Officer Roberts testified that he began observing Kelly when another member of the Airport Drug Task Force, Officer Bevel, advised him that she believed that Kelly had been transporting drugs between Memphis and Los Angeles. According to Roberts's testimony, Bevel also told Roberts that Kelly had at one time been an employee of Delta Airlines.

Thereafter, Roberts and Archer decided to follow Kelly down the concourse toward the baggage area. Officer Roberts testified that Kelly walked slowly, and was "turning around and looking." At the baggage claim area, Roberts testified Kelly "went to the Northwest belt ... and started talking to a tall, slender, male black."

After retrieving his bag, Kelly was approached by officers Archer and Roberts and asked if he objected to talking to them. Kelly said no, and Officer Roberts then asked him if he were from Memphis. Kelly replied yes. When Officer Roberts then asked for identification, Kelly produced an expired Delta employee card. He further explained that he had been laid off from Delta for approximately two years. When asked if he had other identification, he produced a California driver's license, explaining that he had been in Los Angeles for some time. Kelly could not produce his ticket, saying that he had probably left it on the airplane.

At this point, the officers asked Kelly if he had any objection to a search of his luggage, and he consented. Roberts looked through one bag while Archer looked through another. A third bag, however, was locked. Roberts testified that Kelly expressed surprise that the bag was locked and said that he didn't lock it and didn't have a key. (Kelly admitted at the hearing that he lied about the key. Archer testified that Kelly then told the officers: "you can break it open." Roberts thought that to be an unusual statement, but asked Kelly if he would accompany them to an office in order to get into the suitcase. Kelly contends that he did not consent to a search of the third, locked bag, but the district court stated that it "accepts the officers' version as to this consent issue [that Kelly did give consent] as more credible."

Officer Bevel accompanied Roberts and Archer as they escorted Kelly to the office. When the group reached the office, the phone was ringing. Roberts answered the phone, and Archer and Bevel accompanied Kelly into a second room in the office. While Roberts was talking on the phone, Archer asked Kelly if he minded being patted down, as she had lost sight of him in the baggage claim area and wanted to check him for weapons. Archer testified that she wanted to check for weapons because she had lost sight of Kelly for a short time and because "he went behind the baggage area and met up with another

male black." [1] Kelly stated that he did not give consent, but Officer Archer claims that consent was given. The district court believed Kelly's version that consent for the pat-down was *not* given. Archer found some money in Kelly's pocket and some marijuana in his socks.

At this point, Officer Archer arrested Kelly and read him his *Miranda* rights. Then, according to Officer Archer, she said something about "hat[ing] to break that lock" on the suitcase, and Kelly replied that it was unnecessary and gave her the key from his wallet. Kelly contends that Officer Archer simply took the key from his wallet. Using the key, Archer opened the suitcase, and found eleven brick-size packages, which tested positive for cocaine.

The Grand Jury for the Western District of Tennessee returned a one-count indictment charging Kelly with possession with intent to distribute eleven kilograms of a substance containing cocaine, in violation of 21 U.S.C. § 841(a)(1). After an evidentiary hearing on Kelly's Motion to Suppress Evidence, the district court ordered the evidence suppressed, based on its finding that the search of Kelly's person and locked suitcase violated the fourth amendment. The United States appeals from this order.

## II

### A

■ This court can only overturn the district court's factual findings in a suppression hearing if they are clearly erroneous. *United States v. Breen*, 419 F.2d 806 (6th Cir.1969). The court below found that Kelly consented to the initial questioning, and to a search of his bags. However, the court further found that the subsequent search of Kelly's person and then the locked bag were unlawful, because no consent was given to permit the otherwise unlawful search of the person, and that the unlawful search tainted the pre-existing consent to search.

■] The district court found that Kelly was not "seized" under the fourth amendment during the initial questioning or by the request to follow the officers back to the office. We agree. Initial questioning, without more, is not unlawful. *United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The initial questioning led the officers to suspect Kelly of criminal activity, and they asked him to accompany them to their office. Kelly consented, and under these circumstances the trip to the office was reasonable.

### B

■ The search of Kelly's person that led immediately to his arrest was, however, not reasonable under the circumstances. We agree with the district court that this search was unlawful. The officers alleged that such a search was justified because they were checking Kelly for weapons. An officer can legally search for weapons if a reasonably prudent officer in the circumstances would be warranted in the belief that the officer's safety or that of others was in danger. *Terry v. State of Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968).

In the present case, the district court found that a reasonable officer would not have been concerned about safety and that this was simply a pretext for the illegal search. The subject had just disembarked from a plane where it is very difficult to have a weapon because of security devices. Furthermore, the police had only lost sight of Kelly for an extremely short time, if at all. Most convincing of all to the district court was that Officer Archer did not search Kelly's groin area for weapons. Since this is a common area for weapons to be hidden, this omission made belief in the officer's story difficult, though she testified that a weapon in the groin "would have been harder to get to than it would in his leg or pocket...." Based on the facts,

---

1. We note that the multiple references by the officers to Kelly's contact with "a male black" (who apparently turned out to be his brother) add absolutely nothing to the quantum of probable cause or reasonable suspicion.

the district court's finding was not clearly erroneous.[2]

No circumstances existed to make the search of Kelly's person reasonable. A frisk of Kelly at the baggage claim area, absent his consent, would not have been reasonable. No change of circumstances occurred, before the officers searched the locked suitcase pursuant to Kelly's consent, that would have justified the search of Kelly's person in the office.

## C

Because this initial search was unlawful, the subsequent arrest and the search of the locked suitcase pursuant to the arrest would also be unlawful since, absent exigent circumstances or consent, an officer is not to search a locked suitcase without a search warrant. *See United States v. Chadwick*, 433 U.S. 1, 11–12, 97 S.Ct. 2476, 2483–84, 53 L.Ed.2d 538 (1977). There is no argument that exigent circumstances existed.

The officers contend, however, that consent for the search of the bag was given. A warrantless search, although generally considered unreasonable, is valid if conducted pursuant to the person's consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). However, the burden of proving that consent is on the government if there is no warrant. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983). The consent must be freely and voluntarily given, and this must be proven by "clear and positive"

proof. *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir.1977). Therefore, coercion, such as ordering detention until a warrant can be obtained, obviates the consent. *United States v. Jefferson*, 650 F.2d 854, 858 (6th Cir.1981). Consent is a question of fact, and the district court's decision regarding consent will not be overturned unless clearly erroneous. *McCaleb*, 552 F.2d at 720.

In the present case, the district court concluded that consent was not given for either the personal search or the search of the third suitcase. The government counters that the district court's own factual findings show that the defendant stated that the officer could break open his suitcase and that this "consent" was never withdrawn.

The district court's opinion treats it as axiomatic that the consent in the terminal may not be used to justify the search of the suitcase because of what the court calls "the drastic change in circumstances." The court then focuses exclusively on the events after the arrest and poses the question as being only whether the defendant produced the key voluntarily "under the totality of the circumstances."

The law is quite clear that a consent given *after* unlawful treatment such as occurred to Kelly is generally not valid. *See* 3 W. LaFave, *Search and Seizure* § 8.2(d), at 190 (1987) (arguing that prior illegalities invalidate even consents that are voluntary); *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Typically, the consent is invalidated when "the prior illegality is an element

---

**2.** The district court was also skeptical that officer Archer, as a female, was actually conducting a legitimate pat-down of a male for weapons. The court argues that the search "was done in an inner office in the presence of two female officers while a third officer (a male) was in the outer office. It seems certain that the male officer would have been used to complete the pat-down if it were indeed a precaution regarding weapons."

This does not seem to follow, necessarily. If females are to be employed as police officers on an equal basis with males, then delicacy cannot be allowed to be a bar to normal police practice. While it may in fact be the practice that a male officer normally would conduct the pat-down

under these circumstances, it seems unnecessarily stereotyping to discount the sincerity of the motivation behind the search simply because a female conducted it, especially since we know that the male officer's absence was fortuitously engendered by the ringing of the phone.

What rendered the search illegal was the extreme unlikelihood that Kelly was armed and dangerous. *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. Accordingly, although Judge Merritt would uphold the search in part on a view of "delicacy" in police procedure that differs from mine, I would not find the district court's determination clearly erroneous even if I adopted his view.

entering into the equation by which it is ascertained that the individual was coerced." 3 W. LaFave, *Search and Seizure* § 8.2(d) at 190. In this case, however, the "prior illegality," and hence any "coercion," did not occur until after Kelly had freely consented to a search of his bag. The more difficult question therefore, not *heretofore addressed, is whether every unlawful search or seizure, no matter how tangential to the challenged activity, revokes* consent that had previously been given. We do not believe that this result follows automatically and thus decline to hold that a consent can never persist after some type of unlawful intrusion. *Cf.* Note, 67 Colum.L.Rev. 130, 157 (1967) (arguing that consent to a search, once given, may not be withdrawn).

The district court's decision did not rest on a factual finding that consent was revoked. It took as a rule of law that there could be no consent after an unlawful search. This is not a correct statement of law. All of the cases cited where unlawful conduct has vitiated a consent have involved situations where the unlawful conduct *preceded any consent. See United States v. Miller,* 821 F.2d 546 (11th Cir. 1987); *United States v. Thompson,* 712 F.2d 1356 (11th Cir.1983); *United States v. Ballard,* 573 F.2d 913 (5th Cir.1978).

We agree that the occurrence of an unlawful search and arrest, as occurred in this case, could in principle diminish a defendant's ardor for revoking his consent. However, on this record there is no indication at all that Kelly had any desire to revoke the consent (indeed, he denies ever having given consent and claims that he believed he was under arrest from the beginning of the encounter) and there was no lengthy period of time during which such a desire might have been formulated. The officers could have chosen to break into the bag at the baggage claim area, or immediately after entering the office, and could have done so well before the time that they ultimately gained entry to it. Only the fortuitous ringing of the phone diverted Officer Roberts from the task at hand. Thus, "[i]f the police had waited until they had finished the search [of the bag] before

arresting [Kelly,] there would be no problem." *People v. Gallagher,* 55 Mich.App. 613, 223 N.W.2d 92, 94 (Ct.App.1974).

▇ We note, on the evidence before us, that not only did Kelly not initiate any objection or comment adversely affecting his previous consent, he may have voluntarily amplified the consent by producing the key whose existence he had previously denied. There were two stories as to what happened:

(1) Officer Archer says that Kelly voluntarily produced the key, in response to her none-too-subtle indication that the officers would otherwise carry through on his consent and break open the bag;

(2) Kelly contends that he never did produce the key, but that Archer simply took it from his billfold without his consent.

We do not read either of these stories (and the district judge did not explicitly choose between them) as automatically revoking the consent given in the terminal. If Kelly did produce the key voluntarily, it could have been in an effort to get some credit for cooperating, recognizing that the officers would in any case carry through on his consent and open the bag. If the key had not been found or identified during the officer's search, then, as Archer contends, there was no reason for Kelly to produce it other than forestalling the officers from actually carrying out his consent to break into the bag. Alternatively, if the officer simply took the key, it would have no necessary connection with negating the already expressed consent to break open the bag.

The withholding of the key, if that is what happened, might militate strongly in favor of a finding of no consent, were it not for the credited testimony of the officers that Kelly volunteered that the officers could break open the bag. In two Ninth Circuit cases, *Cipres v. United States,* 343 F.2d 95 (9th Cir.1965), and *Montana v. Tomich,* 332 F.2d 987 (9th Cir.1964), the Ninth Circuit held that where words of consent were accompanied by the withholding or denial of means of effectuating the consent, the original consent could be

found invalid. In *Cipres,* the defendant said her bags were locked and the keys were in New York. However, as soon as the officers examined the bags and found them unlocked, she asked whether they had a warrant. *Cipres,* 343 F.2d at 97. In *Tomich,* the defendant, who was already under arrest, said the officers could search his car's trunk, but then said, "I don't have a key, so you can't open it." *Tomich,* 332 F.2d at 989. The trial court found that no other consent was given at any time prior to the police breaking into the trunk.

In both cases, the court focused on the inconsistency between the verbal representations and the alleged consentor's actions. In *Cipres,* it noted that the consent (which the court also noted might not have been completely voluntary) "was coupled with [a] statement ... which on its face would have rendered the consent ineffectual...." *Cipres,* 343 F.2d at 98. In *Tomich,* the trial court had emphasized that "[i]f [defendant] truly consented to the search, he would have delivered up the key to the officers and saved them all the trouble they went to to get into the trunk of the car." *Application of Tomich,* 221 F.Supp. 500, 503 (D.Mont.1963). In our case, on the other hand, defendant's explicit consent to the breaking open of the bag furnished the means of effectuating his consent.

The only circumstance under which the "chilling effect" theory would make any sense would be if Kelly's consent had been entirely a sham, and once he got out of the public eye and saw that the officers actually intended to hold him to his word and break open the bag, he would have objected, had it not been for the unlawful search.[3] On the current record, this is complete speculation. Whether additional testimony bearing on that point can be adduced after remand is an issue best left to the district court on that remand. We

hold that the suppression order should be reversed, subject to a renewed motion at the district court under the proper standard.

The order of the district court suppressing evidence is REVERSED and the case remanded for further proceedings consistent with this opinion.

MERRITT, Chief Judge, concurring.

I would also remand this case to the District Court for reconsideration of the locked-suitcase search issue, but my reasons for the remand and my theory of the case are somewhat different from the Court's. I do not see the pat-down search of the defendant's person by the female officers as an illegal search. I would attribute no significance to the fact that the female officers did not search the defendant's genital area. The breakdown of Victorian values notwithstanding, I would not fault a female officer for failing to touch a male suspect's groin in conducting a search of the person. Social sensitivity about stereognosis of the male groin should not been seen as sexual "stereotyping," as the Court suggests. Nor would I suggest that compunctions about the stereognosis of the breasts and genital area of a female suspect "stereotypes" the male officer. Officers should continue to have some sense of "delicacy," as the Court calls it.

With this out of the way, it seems to me standard procedures for officers to pat down suspects where there are grounds for a stop. *Terry v. Ohio* allows a "stop and frisk" in these circumstances. Many officers have been injured or killed in the past because they have failed to frisk suspects for concealed guns and knives. I find nothing unreasonable about the pat-down search which instead of turning up a weapon turned up marijuana.

---

**3.** One circuit court case held that a person who is actually carrying contraband, but who does not admit guilt, would never consent to a search by police. *Higgins v. United States,* 209 F.2d 819, 820 (D.C.Cir.1954). However, this rule has been overwhelmingly rejected by other courts. *See, e.g., United States v. Mendenhall,* 446 U.S. at 559, 100 S.Ct. at 1879; *United States v. Williams,* 754 F.2d 672, 675–76 (6th Cir.1985); *United*

States v. Manchester, 711 F.2d 458, 462 (1st Cir.1983); *United States v. Robinson,* 625 F.2d 1211, 1218–19, n. 12 (5th Cir.1980); *United States v. Ciovacco,* 518 F.2d 29, 30–31 (1st Cir. 1975); *United States v. Piet,* 498 F.2d 178, 182 (7th Cir.), *cert. denied,* 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 664 (1974); *Leavitt v. Howard,* 462 F.2d 992, 997 (1st Cir.1972).

Therefore, I conclude that the pat-down search was legal and that the arrest based upon the marijuana was lawful. I would, therefore, remand the case to the District Court for reconsideration in light of the lawfulness of the search and the arrest, reversing the District Court's conclusion that the search and arrest were unlawful.