UNITED STATES of America,
Plaintiff–Appellee,

v.

Terry James PIERRE and Otis Harris,
III, Defendants–Appellants.

No. 90–8273.

United States Court of Appeals,
Fifth Circuit.

May 21, 1991.

Kenneth D. DeHart, Alpine, Tex., (court-appointed), for Pierre.

Charles Louis Roberts, El Paso, Tex., for Harris.

W.W. Torrey, LeRoy Morgan Jahn, Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for the U.S.

Before RUBIN, POLITZ, and DUHÉ, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

We consider whether a border patrol agent conducted a search when he put his head inside a vehicle and, if so, whether the effect of the search was dissipated by the later consent of the driver to the opening of a suitcase found to contain cocaine. We reverse the driver's convictions for conspiracy and possession with intent to distribute, which rested on denial of his motion to suppress the content of the suitcase. As to the codefendant passenger, we find the evidence insufficient to support the verdict on either charge and reverse his convictions.

I

FACTS AND PROCEEDINGS BELOW

In early November, 1989, Terry Pierre, Derrick Turner, and Calvin Broadnax left New Orleans in a 1987 GMC Jimmy bound for Los Angeles. Each advanced a different reason for making the trip: Broadnax, a man of unspecified occupation, had said he wanted to purchase a two-seat chocolate brown Mercedes Benz; appellant Pierre, a carpenter who had learned his trade at Angola state prison and who had worked

on several of Broadnax's homes, was to drive one of the two vehicles back to New Orleans for Broadnax; Turner, a nineteen year-old high school student, said he was missing school and going all the way to Los Angeles to buy a jacket at a swap meet. They stayed in L.A. for nearly a week, with Broadnax paying all expenses. There they met Otis Harris, a New Orleans resident who had been living in California and whom Broadnax had known when both were children.

On November 14, just before leaving Los Angeles, Broadnax told Pierre, Harris, and Turner that he wouldn't be returning to New Orleans with them. The three then departed from Los Angeles in the Jimmy without Broadnax. Pierre drove most of the way, with Harris relieving him some time before they reached the border patrol checkpoint at Sierra Blanca, Texas. Turner denied that he had driven the Jimmy at any time on the return trip. Approximately an hour before reaching the checkpoint, Pierre and Harris smoked some marihuana. Turner denied that he had smoked any.

Border Patrol Agent Lonny Hillin stopped the Jimmy when it reached the Sierra Blanca checkpoint. At that time, Harris was driving, Turner was in the passenger seat, and Pierre was resting in the back. Harris rolled down his window. Hillin asked Harris and Turner if they were citizens; both responded in the affirmative. Hillin then inserted his head through the window into the car, purportedly to get a clear view of Pierre in the back seat. At that moment, Hillin smelled burned marihuana. He then directed Harris to pull the Jimmy into the secondary inspection area.

In the secondary area, Harris exited the vehicle. Hillin asked if Harris would object to his searching the luggage; Harris said he did not. Harris opened the back of the vehicle and lowered the tailgate. He then took out and opened each piece of luggage for Hillin to inspect, until only a grey Samsonite suitcase, resting against the back seat, remained. All of the occupants of the vehicle, including Turner, testified that they had never seen the suitcase before.

Harris snapped open the latch, then suddenly paused and closed it again. He told Hillin that the suitcase was locked and that he was unable to open it. Hillin took the suitcase and opened it himself, discovering six tape-wrapped bundles that later proved to contain 13.8 pounds of cocaine.

All three men were arrested and searched. Pierre was in possession of a small baggie of marihuana, a baggie containing 0.4 grams of cocaine, and a razor blade with cocaine residue on it. Harris had a short piece of straw, also with cocaine residue on it. No contraband was found on Turner, and he was never charged.

A jury convicted both Pierre and Harris on one count of conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846, and one count of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Pierre was sentenced to concurrent 188–month terms of imprisonment on each count and concurrent five-year terms of supervised release. Harris was sentenced to concurrent 360–month terms of imprisonment and concurrent five-year terms of supervised release.

## II

## SUFFICIENCY OF THE EVIDENCE AGAINST HARRIS

■ Harris argues that the evidence adduced against him at trial was insufficient to support his convictions. We believe that, viewing the evidence most favorably to the Government, a reasonable jury could find beyond a reasonable doubt that Harris possessed cocaine with intent to distribute. To do so, the jury had to find (1) knowing (2) possession (3) with intent to distribute.[1]

Harris testified that, just as they were preparing to leave Los Angeles, Calvin Broadnax instructed Harris, Pierre, and Turner to follow him to an undesignated location that proved to be the spacious Carson, California home of Don Tanner, whom Broadnax knew. Harris recalled that, as

---

1. *United States v. Anchondo–Sandoval,* 910 F.2d 1234, 1236 (5th Cir.1990).

they entered, Tanner said to Broadnax, "Hey, Calvin, I wasn't able to get but four of them chickens, man." Broadnax responded, "Well, that is okay, man, I got two." Harris testified that, from divers sources, he was aware that dealers often used references to poultry as a code for kilos of cocaine.

Harris, Pierre, and Turner were ushered into Tanner's large entertainment room while Broadnax and Tanner went to a different part of the house. Pierre went to the other end of the room to play pool while Harris and Turner watched a large screen television and sipped wine. Harris then saw Broadnax coming down the hallway with a suitcase in his hand. Broadnax asked Turner if he had the key, to which Turner replied, "No, Junie got the key." Having known Broadnax from childhood, Harris knew that Junie was Broadnax's cousin and was a reputed drug dealer. Broadnax then went outside. He returned forty minutes later, and told Harris, Turner, and Pierre that he would not be returning with them to New Orleans.

■■ We note that the Government's witness, Derrick Turner, denied that any of this happened—that they ever visited Don Tanner—and that the Government in closing argued to the jury that it should accept Turner's version of events. Even so, our task compels us to draw all inferences from the evidence and make all credibility choices in favor of sustaining the jury's verdict.[2] We are not bound to accept the Government's theory of the case, even when doing so would, as here, raise serious questions about the sufficiency of the evidence. Because Harris's testimony in this respect provides the only competent evidence to support the verdict, we accept it as true. We therefore believe that a reasonable jury could find that Harris knew that the suitcase contained cocaine.

We also believe that a reasonable jury could find that Harris knew the suitcase was in the vehicle. The suitcase was relatively large and was the only piece of hard

luggage in the vehicle, the storage of area of the Jimmy was relatively small, and Agent Hillin testified that the suitcase was in view, standing upright in the right side of the storage area, pushed up against the back seat. The jury could infer simply from the circumstances—the nature of the vehicle, the nature of the suitcase, and the nature of the journey itself—that Harris knew that the suitcase was in the vehicle. In addition, Harris testified that he had gone into the back of the vehicle during the trip to get a jacket out of his luggage. The jury could also infer that he became aware of the suitcase at that time, even if he was not aware of it before.

■ Once Harris's knowledge of the suitcase and its contents are established, it is but a small leap to find possession. Both Agent Hillin and Harris testified that Harris purported to consent—even though he might have tried implicitly to withdraw that consent—to a search of the suitcase. That alone is sufficient basis for the jury to infer that Harris exercised or had the right to exercise dominion or control over the suitcase.

The evidence was therefore sufficient to sustain Harris's conviction for possessing cocaine with intent to distribute. We offer no opinion on whether, in light of Harris's testimony, it might also have been sufficient to link Harris to a Broadnax–Tanner–Turner conspiracy, for such a conspiracy was neither pleaded by the Government nor proved at trial. In any case, finding the evidence sufficient as to one count, we must consider Harris's Fourth Amendment claim.

### III

### THE SIERRA BLANCA SEARCH

Harris argues that Agent Hillin conducted an illegal search, violating his Fourth Amendment rights, by inserting his head into the vehicle through the driver-side window, and that the cocaine later discovered as the fruit of this illegal search should

---

2. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Malatesta,* 590 F.2d 1379, 1382 (5th Cir.), *cert. denied sub nom. Bertolotti v. United States,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979).

have been suppressed. Harris points out that only after Agent Hillin's "headlong" intrusion did the Agent smell the burned marihuana, which gave him probable cause for his later search of the suitcase.

The Border Patrol agents at the Sierra Blanca checkpoint have apparently made it a practice to insert their heads into vehicles lawfully[3] stopped for immigration checks. Similar conduct by Border Patrol agents at the Sierra Blanca checkpoint has been challenged in this court at least twice before,[4] and in one of those cases Agent Hillin testified that he put his head through the window of every car he stops at the checkpoint.[5] In neither of those cases, however, did we squarely address the lawfulness of the agents' practice under the Fourth Amendment. In *United States v. Sheppard*, a panel of this court assumed without deciding that a "headlong" intrusion by Agent Hillin amounted to a Fourth Amendment "search", but held over a vigorous dissent that the defendant's consent to the subsequent search of the trunk of his vehicle and his unsuccessful flight from custody attenuated any taint that flowed from such a search.[6] In *United States v. Marshall*, we again declined to decide whether such an intrusion by another agent, Gilbert Guaderama, who played a minor supporting role in this case, constituted a search. Instead, we held that, because Agent Guaderama had detected the strong odors of marihuana and perfume before inserting his head into the defendant's vehicle, he had probable cause to conduct a search.[7]

To determine the legality of the vehicle search, we must traverse anew the rough terrain of Fourth Amendment jurisprudence. Our inquiry is tripartite: First, did Agent Hillin make a "search" governed by the Fourth Amendment when he put his head into the vehicle? Second, if so, was the search reasonable? Finally, if the initial search was unreasonable, must the evidence discovered in the subsequent search of the suitcase be suppressed?

### A. *Was the intrusion a search?*

The central concern of the Fourth Amendment is to protect people from "unreasonable government intrusions into their legitimate expectations of privacy."[8] That Harris had a reasonable and legitimate expectation of privacy in the interior of the GMC Jimmy is not disputed. "While the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home, a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusion by the police."[9]

The Government's contention that this was not a search turns, therefore, on whether Agent Hillin "intruded" upon Harris's reasonable expectation of privacy. In this respect, the case before us is indistinguishable from the Supreme Court's decision in *New York v. Class*.[10] In *Class*, a police officer reached into the defendant's car to move some papers on the dashboard that obscured the vehicle identification number, and in the process of doing so saw the handle of a gun protruding from beneath the driver's seat. The Court held "that the intrusion into that space [the car's interior] constituted a search."[11] The fact that the officer in *Class* made physical contact with objects inside the car, whereas Agent Hillin did not, is immaterial: It was the officer's act of reaching into the auto-

---

**3.** *See United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Jackson*, 825 F.2d 853 (5th Cir.1987) (en banc), *cert. denied sub nom. Ryan v. United States*, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988).

**4.** *United States v. Sheppard*, 901 F.2d 1230 (5th Cir.1990); *United States v. Marshall*, 878 F.2d 161 (5th Cir.1989).

**5.** *Sheppard*, 901 F.2d at 1239 n. 3.

**6.** *Id.* at 1234–36.

**7.** *Marshall*, 878 F.2d at 162–63.

**8.** *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977).

**9.** *New York v. Class*, 475 U.S. 106, 114–15, 106 S.Ct. 960, 966, 89 L.Ed.2d 81 (1986).

**10.** 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986).

**11.** *Id.* at 115, 106 S.Ct. at 966.

mobile, not his shuffling of the papers, that allowed him to see the gun handle and that the Supreme Court held to be a search.

The Government argues that Agent Hillin's intrusion in this case is no different from the practices sanctioned in the so-called "flashlight" cases, holding that it is not a search for the police to use artificial illumination,[12] aerial photography,[13] electronic tracking devices,[14] binoculars,[15] or other technology to aid their perception of objects in "plain view." That invocation begs the question. These cases uniformly rest on the axiom that one has no reasonable expectation of privacy in what one exposes to public view (or public smell).[16] They presuppose, and it is integral to the plain-view doctrine as it relates both to defining searches and to regulating seizures, that the viewer (or smeller, as the case may be) is where he lawfully has a right to be.[17] As one commentator put it, "Light waves cross thresholds with a constitutional impunity not permitted arms and legs [or noses]. Wherever the eye may go, the body of the policeman may not necessarily follow." [18] These cases, therefore, are relevant only if Agent Hillin's head was lawfully within the vehicle—but that, of course, is the very question before us.

■ In this case, the district court found on the record that Agent Hillin "stuck his head through the driver's side window." The agent thus effected a physical intrusion into the vehicle. While an officer's act need not constitute a physical intrusion to be a "search",[19] we are aware of no case holding that an officer did *not* conduct a "search" when he physically intruded part of his body into a space in which the suspect had a reasonable expectation of privacy. Agent Hillin's physical intrusion allowed him to see and to smell things he could not see or smell from outside the vehicle, and, indeed, that was his declared purpose: he "ducked [his] head in to get a clear view of the backseat." In doing so, his inspection went beyond "that portion of the vehicle which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers," [20] and into the area protected by the Fourth Amendment, just as much as if he had stuck his head inside the open window of a home. A number of state courts, applying both state and federal law, have held, in accordance with this view, that similar conduct constituted a search.[21]

## B. *Was the search reasonable?*

The Fourth Amendment proscribes only unreasonable searches. Contrary to intimations in some of the opinions both of this

**12.** *E.g., United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 1141, 94 L.Ed.2d 326 (1987); *Brown,* 103 S.Ct. at 1542 & n. 5 (citing cases).

**13.** *E.g., Dow Chemical Co. v. United States,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986).

**14.** *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983).

**15.** *United States v. Grimes,* 426 F.2d 706 (5th Cir.1970).

**16.** *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 1629, 100 L.Ed.2d 30 (1988); *Katz,* 88 S.Ct. at 511; *United States v. Lovell,* 849 F.2d 910 (5th Cir.1988). *See generally* 1 W. La Fave, *Search & Seizure* § 2.2(a) (1987 & Supp.1990).

**17.** *See Horton v. California,* —— U.S. ——, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990); *Brown,* 103 S.Ct. at 1541–42.

**18.** Moylan, *The Plain View Doctrine: Unexpected Child of the Great "Search Incident" Geography Battle,* 26 Mercer L.Rev. 1047, 1096

(1975) (quoted in 1 W. La Fave, *supra* note 16, at 324).

**19.** *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967); *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984); *see United States v. Winsor,* 846 F.2d 1569 (9th Cir.1988) (en banc).

**20.** *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983) (plurality opinion).

**21.** *See People v. Superior Court,* 3 Cal.3d 807, 91 Cal.Rptr. 729, 478 P.2d 449 (Cal.1970) (opening car door to see interior); *People v. Anderson,* 176 Ill.App.3d 348, 125 Ill.Dec. 937, 531 N.E.2d 116 (Ill.App.Ct.1988) (opening car door to ascertain gross weight of vehicle); *State v. Epperson,* 237 Kan. 707, 703 P.2d 761 (Kan.1985) (officer leaned into car to shine flashlight under seats); *State v. Larocco,* 794 P.2d 460 (Utah 1990) (officer opened door).

court[22] and others,[23] however, the Supreme Court has not abandoned the traditional Fourth Amendment inquiry for either automobile or immigration checkpoint searches conducted away from the border or its functional equivalents.

■ We do not decide the reasonableness of searches by "balancing the need to search against the invasion which the search entails"[24] on an ad hoc basis. As the Ninth Circuit, sitting en banc, recognized, "The intrusiveness of the search is *not* measured by its scope, *but by the expectation of privacy upon which the search intrudes.*"[25] A search does not become permissible because the physical intrusion is minimal and consisted only of the bare insertion of an officer's head into a vehicle's window, or the insertion of his hand into a home. The Supreme Court recently made this point quite clear, albeit in the context of a dwelling-place search, in *Arizona v. Hicks:*[26] " '[T]he distinction between "looking" at a suspicious object and "moving" it even a few inches' is much more than trivial for purposes of the Fourth Amendment.... A search is a search, even if it happens to disclose nothing but the bottom of a turntable."[27]

When we balance the need for a search against its intrusiveness, we usually do so to judge "the permissibility of a particular law enforcement *practice,*"[28] not the permissibility of a particular search. The only

exception to this rule *may* be—though this point is controversial—in the limited context of supervisory searches, in which we judge a given search by "the standard of reasonableness under all the circumstances."[29]

■ Hillin's was not a supervisory search. The Government's argument that Hillin intruded into the vehicle only to establish eye contact with its passengers is therefore irrelevant. The district court did not decide whether this was his real motive, and we need not probe this, for once the Supreme Court has struck the balance, as we believe it has here, it is not our task to reweigh the relevant interests in every case that comes before us. As the en banc court noted in *United States v. Jackson,*[30] when "the Fourth Amendment balance between the government intrusion and individual's privacy right under [given] circumstances has been struck by the Supreme Court[,] ... that is dispositive of the issue for us."[31]

■ In *Jackson,* this court held that the fixed checkpoint at Sierra Blanca was not the "functional equivalent" of the international border.[32] We determined, therefore, that the Border Patrol's operations at the checkpoint are governed by the Supreme Court's decisions in *United States v. Mar-*

---

22. *E.g., United States v. Marshall,* 878 F.2d 161, 163 (5th Cir.1989).

23. *E.g., United States v. White,* 766 F.2d 1328, 1332 (9th Cir.1985).

24. *New Jersey v. T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985) (quoting *Camara v. Municipal Court,* 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1734–35, 18 L.Ed.2d 930 (1976)).

25. *United States v. Winsor,* 846 F.2d 1569, 1574 (9th Cir.1988) (en banc) (emphasis added).

26. 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

27. *Id.* 107 S.Ct. at 1152–53.

28. *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 1541–42, 75 L.Ed.2d 502 (1983) (plurality opinion) (quoting *Delaware v. Prouse,* 440 U.S. 648,

99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)) (emphasis added).

29. *O'Connor v. Ortega,* 480 U.S. 709, 725–26, 107 S.Ct. 1492, 1501–02, 94 L.Ed.2d 714 (1987). *See Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). *See generally* 4 W. La Fave, *supra* note 16, §§ 10.10–10.11; Note, *Investigating Child Abuse: The Fourth Amendment and Investigatory Home Visits,* 89 Colum.L.Rev. 1034, 1039–41, 1061–62 (1989).

30. 825 F.2d 853 (5th Cir.1987) (en banc).

31. *Id.* at 862.

32. *Id.* at 857–60.

*tinez–Fuerte*[33] and *United States v. Ortiz.*[34] Those cases state what is required to justify a vehicle search in no uncertain terms: "[C]heckpoint searches are constitutional *only if justified by consent or probable cause to search.*"[35]

 The Government does not contend, and the record contains no evidence, that Agent Hillin had any "objectively justifiable suspicion,"[36] whether or not it rose to the level of probable cause, warranting a search of the GMC Jimmy or its occupants. We conclude that Agent Hillin's search was not justified at its inception, and that the search was therefore unreasonable under the Fourth Amendment.

### C. *Must the cocaine be suppressed?*

Of course, Harris does not seek to suppress the odor of marihuana that Agent Hillin noticed during his illegal search, but only to suppress the cocaine discovered in the suitcase found in the back of the Jimmy. Harris claims that the cocaine is the fruit of Agent Hillin's illegal search. The Government argues that any taint resulting from Agent Hillin's search was attenuated by Harris's voluntary consent to Agent Hillin's search of the luggage.

Absent Harris's consent, there can be no doubt that the cocaine Agent Hillin found in the suitcase was the fruit of his prior illegal search. Had he not searched the interior of the vehicle he would not have smelled the marihuana; had he not smelled the marihuana, he would not have had probable cause to search the luggage.[37] Relying on our decision in *United States v. Sheppard,*[38] however, the Government argues that Harris's consent to Agent Hillin's search of the suitcase, given without knowledge that Agent Hillin had smelled marihuana, broke the connection between Agent Hillin's prior illegality and the discovery of the cocaine, and that the evidence should therefore be admissible.

Whether this is so can be resolved only by examining the primary dispute between the majority and dissenting opinions in *Sheppard.* In that case, Agent Hillin conducted the same sort of intrusion into the defendant's vehicle. The defendant, however, subsequently and voluntarily consented to the search of his trunk and of a suit bag that was found in it. Agent Hillin discovered a brick-shaped object wrapped in duct tape in the suit bag, and informed Sheppard that he and his passenger would be detained pending investigation of the object. Sheppard and his passenger pushed Hillin away, leapt into their car, and fled into the desert with the Border Patrol in hot pursuit. The agents saw Sheppard stop his car and throw objects into the brush that were later found to be bricks of cocaine. The chase ended when Sheppard's car suffered a blowout.

The *Sheppard* majority, relying on the 1971 case of *United States v. Fike,*[39] held that the Sheppard's voluntary consent to the search of his trunk, along with Sheppard's flight from custody, "broke the causal connection between the alleged primary illegality and the evidence introduced at trial."[40]

In dissent, Judge King argued that this

---

**33.** 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

**34.** 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975).

**35.** *Martinez–Fuerte,* 96 S.Ct. at 3087 (emphasis added); *accord, Ortiz,* 95 S.Ct. at 2598; *Jackson,* 825 F.2d at 861–62; *United States v. Frisbie,* 550 F.2d 335, 340 (5th Cir.1977). *See also United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

**36.** *New York v. Class,* 475 U.S. 106, 106 S.Ct. 960, 967–68, 89 L.Ed.2d 81 (1986).

**37.** *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Nardone v. United States,* 308 U.S. 338, 340, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939); *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920).

**38.** 901 F.2d 1230 (5th Cir.1990).

**39.** 449 F.2d 191 (5th Cir.1971).

**40.** *Sheppard,* 901 F.2d at 1234.

court held in *United States v. Robinson*[41] that the Supreme Court, in *Brown v. Illinois*,[42] had "laid to rest" the method of analysis employed in *Fike*.[43] Judge King pointed to our 1984 decision, *United States v. Melendez–Gonzalez*,[44] which the *Sheppard* majority recognized as clearly inconsistent with *Fike*,[45] to support her contention.[46] The majority declined to accept *Melendez–Gonzalez* as the rule of the circuit, however, as *Fike* was the earlier case.[47]

Whether the law of the circuit requires a two-step inquiry into voluntariness and attenuation, as stated in *Robinson* and *Melendez–Gonzalez*, or whether it requires only the one step inquiry into voluntariness, as stated in *Sheppard* and *Fike*, is not resolved by the *Sheppard* court's conclusion on this point, for if the view of the *Sheppard* majority on the continuing vitality of *Fike* is inconsistent with the holdings in *Robinson* and *Melendez–Gonzalez*, the earlier cases are presumptively correct.[48]

In *United States v. Fike*,[49] the defendant was convicted of transporting a stolen automobile in interstate commerce. The police conducted what the court assumed to be an illegal search of the defendant's vehicle in his absence and discovered bolt cutters and license plates in the trunk. The defendant was arrested, and voluntarily consented to a second search of the car. As a result of the second search, the police ascertained the car's vehicle identification number, which matched that of a car reported stolen three days earlier. The VIN was the evidence the defendant sought to suppress as fruit of the prior illegal search.[50] This court held that the evidence was admissible, concluding that voluntary consent "is an independent act sufficient to break any causal chain which may exist between the alleged primary illegality of the first search and the evidence seized as a result of the second search and introduced at trial."[51]

Four years later, the Supreme Court faced a similar issue in *Brown v. Illinois*.[52] While investigating a murder, the Chicago police broke into and searched Brown's apartment without probable cause or a warrant, and then illegally arrested Brown when he arrived home. The police gave Brown the *Miranda* warning before he was interrogated, and repeated this twice more during the interrogation. Brown confessed, twice giving the police detailed accounts of the murder. The confessions were admitted at his trial, and Brown was convicted of murder. On appeal, the Illinois Supreme Court affirmed, holding that " 'the giving of the *Miranda* warnings ... served to break the causal connection between the illegal arrest and the giving of the statements, and that defendant's act in making the statements was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." ' "[53]

The Supreme Court reversed. The Court began by emphasizing that the primary purpose of the exclusionary rule " 'is to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive

---

**41.** 625 F.2d 1211 (5th Cir.1980).

**42.** 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

**43.** *Sheppard,* 901 F.2d at 1238 (King, J., dissenting).

**44.** 727 F.2d 407 (5th Cir.1984).

**45.** *Sheppard,* 901 F.2d at 1235 n. 8.

**46.** *Id.* at 1238–39 (King, J., dissenting).

**47.** *Id.* at 1235 n. 8.

**48.** *See Alcorn County v. U.S. Interstate Supplies, Inc.,* 731 F.2d 1160, 1166 (5th Cir.1984).

**49.** 449 F.2d 191 (5th Cir.1971).

**50.** *Id.* at 191–92.

**51.** *Id.* at 194.

**52.** 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

**53.** *Id.* 95 S.Ct. at 2258 (quoting *People v. Brown,* 56 Ill.2d 312, 317, 307 N.E.2d 356, 368 (Ill.1974) (quoting *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963))).

to disregard it.' " [54] Unlike the Fifth Amendment rights *Miranda* was crafted to protect, the Fourth Amendment "is directed at *all* unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits." [55] If the Court were to hold that the *Miranda* warnings by itself purged any taint from statements made subsequent to an illegal arrest, "regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted": [56]

> Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure-all," and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to "a form of words." [57]

Though it is possible, the Court noted, that persons illegally arrested might indeed make free and voluntary confessions unaffected by the initial illegality, the *Miranda* warning alone "cannot assure in every case that the Fourth Amendment violation has not been unduly exploited." [58]

The *Brown* Court rejected any "talismanic test" for ascertaining whether a confession was "obtained by exploitation of an illegal arrest." [59] The Court declared first that "voluntariness ... is a threshold requirement." Once the confession has been found voluntary, several other factors must be considered to determine whether, in spite of the voluntariness of the confes-

sion, law enforcement officials unduly exploited their prior illegal conduct: (1) the temporal proximity of the arrest and the confession; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. [60] "And the burden of showing admissibility rests, of course, on the prosecution." [61]

In *United States v. Robinson,* [62] this court assumed for purposes of its analysis that Robinson was illegally arrested by D.E.A. agents at the Atlanta airport. Subsequent to the arrest, Robinson consented to a search of his briefcase and his person. The agents discovered a package of cocaine inside a paraplegic diaper that Robinson was wearing. The question before the court was therefore whether "the connection between the [illegal seizure] and the consent to search was sufficiently attenuated." [63]

The *Robinson* court held that the district court erred by employing the one-step analysis used in *Fike,* rather than the two-step analysis set out in *Brown.* [64] The court remanded for fact finding on the attenuation issue with the following instructions:

> Contrary to the magistrate's view of the law, a voluntary consent to search *does not remove the taint of an illegal seizure.* Rather, voluntariness is merely a threshold requirement. The "causal connection" between the illegal seizure and the consent to search must be independently examined, utilizing the factors set out in *Brown* in light of the policies to be served by the fourth amendment exclusionary rule. Because the magistrate failed to apply the "causal connection" test in this case, Robinson was deprived

**54.** *Id.* 95 S.Ct. at 2260 (quoting *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960)).

**55.** *Id.* (emphasis added).

**56.** *Id.* 95 S.Ct. at 2261.

**57.** *Id.* (citing *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)).

**58.** *Id.*

**59.** *Id.*

**60.** *Id.* 95 S.Ct. at 2261–62.

**61.** *Id.* at 2262.

**62.** 625 F.2d 1211 (5th Cir.1980).

**63.** *Id.* at 1219.

**64.** *Id.* at 1220 & n. 14.

of the protection the test was designed to afford.[65]

In *United States v. Melendez–Gonzalez*,[66] two Border Patrol agents, having illegally stopped the defendant's car, illegally searched its trunk. When they pried the trunk partially open with a tire iron, they saw a large burlap sack and could smell marihuana. The agents arrested Melendez and took him to the station, where he voluntarily consented to a further search of the trunk. The agents found twenty-one pounds of marihuana in the burlap bag.

Though citing neither *Brown* nor *Robinson*, this court rejected the Government's argument that Melendez's later consent broke the connection between the consent search and the agents' illegal search and seizure of Melendez's car. "In addition to proving valid and voluntary consent," the court held, "the Government must *also* establish the existence of intervening factors which prove that the consent was sufficiently attenuated" from the prior illegality.[67] The Government had failed to do so in that case.

Our review of *Brown* and the subsequent decisions of this court lead us to the conclusion that *Fike* was displaced by *Brown*, a later Supreme Court decision, as well as by other Fifth Circuit decisions that properly followed *Brown* instead of the earlier circuit case. The question remains whether we are bound in this case to follow *Sheppard*'s conclusion that the *Brown* factors militate in favor of finding Sheppard's voluntary consent alone rendered Agent Hillin's subsequent search untainted by his previous illegality. We conclude that we are not for several reasons.

First, *Sheppard*'s brief application of the *Brown* factors to the question whether Sheppard's consent alone broke the causal connection is dicta. Under the *Fike* approach, which the *Sheppard* majority purported to be "bound" to follow,[68] analysis of the factors set out in *Brown* was simply unnecessary. *Fike* by its own terms mandated a finding of attenuation. Furthermore, even under the *Brown* approach, determining whether consent alone was sufficient was unnecessary. The facts in *Sheppard* demonstrate, and the *Sheppard* court recognized, that there was a material and perhaps dispositive "intervening circumstance": Sheppard's "illegal flight from the secondary inspection area ... constituted criminal activity and functioned to break any nexus between the challenged insertion of Hillin's head into the window and evidence seized following the apprehension of Sheppard and Tobin."[69] *All* of the evidence Sheppard sought to suppress was seized *after* his illegal flight from the inspection area. Therefore, whether one reads the opinion as stating that Sheppard's *flight* alone, or that Sheppard's consent *plus* his flight, broke the connection between the illegal search and the seizure of the evidence, the opinion clearly does not hold that *consent* alone did so.

Second, as the *Sheppard* majority stated,[70] *Melendez–Gonzalez*, though not explicitly acknowledging *Brown*, reached the opposite conclusion applying the same method of analysis. As noted above, the *Sheppard* court did not consider the earlier *Melendez–Gonzalez* decision binding (or even persuasive) authority, for it considered itself bound by *Fike*.

Finally, examination of the *Sheppard* majority's application of the *Brown* factors reveals that its analysis gave a paramount role to the voluntariness of the consent. The court repeatedly emphasized that Sheppard was unaware that Agent Hillin had smelled marihuana.[71] But Sheppard's awareness of that fact was relevant only to the threshold determination of voluntariness, which was not the direct issue before the court. That fact had no bearing on the

---

**65.** *Id.* at 1220 (emphasis added).

**66.** 727 F.2d 407 (5th Cir.1984).

**67.** *Id.* at 414 (emphasis added).

**68.** *United States v. Sheppard,* 901 F.2d 1230, 1235 n. 8 (5th Cir.1990).

**69.** *Id.* at 1235.

**70.** *Id.* at 1235 n. 8.

**71.** *Id.* at 1234, 1235 n. 10, 1236 n. 11.

issue of whether Agent Hillin's prior illegal search had been "unduly exploited."[72]

We therefore choose to "independently examine[ ]" the *Brown* factors, "in light of the policies to be served by the [F]ourth [A]mendment exclusionary rule."[73]

 We accept for purposes of this decision the district court's conclusion that Harris validly and voluntarily consented to the search of the suitcase, though, again unlike *Sheppard* and as will be explained below, the validity of the consent here is open to question. To determine whether that consent broke the causal connection between Agent Hillin's illegal intrusion and his search of the suitcase, we must consider (1) the temporal proximity of the search and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct.[74]

 First, the record clearly establishes that only moments—at most three or four minutes—passed between Agent Hillin's illegal intrusion and his discovery of the cocaine. Second, the record indicates that nothing of significance, and certainly nothing as significant as flight from custody, occurred between Agent Hillin's illegal search and his search pursuant to Harris's consent.

 There is, however, little in this record regarding the purpose or flagrancy of Agent Hillin's search, beyond the nature and scope of the search itself. Under most circumstances, therefore, the proper disposition would be to remand the case to the district court for fact finding.[75] Here, however, we are dealing with the same Border Patrol Agent, the same checkpoint, and the same conduct at issue in *Sheppard.* We therefore think it appropriate, in the interest of judicial economy, to take judicial notice of the testimony Agent Hillin provided in that case, confident that any testimony he gave on remand would be consistent. Agent Hillin testified in *Sheppard* that the purpose of putting his head through the window was to establish eye contact with the occupants, in order to judge "the veracity or evasiveness of a person's response to questions."[76] That is consistent with his testimony in this case that he wanted to get a "clear view" of Pierre lying down in the back seat. Agent Hillin also testified in *Sheppard* that he sticks his head through the window of every automobile that he checks.[77] We construe this to mean that Agent Hillin's illegal search was (1) made for the purpose of uncovering evidence of wrongdoing, (2) conducted without a hint of individualized suspicion, and (3) part of an ongoing series of illegal searches.

The *Sheppard* majority, faced with the same testimony, assessed the "purpose and flagrancy" factor somewhat differently. The *Sheppard* court concluded, first, that there was "no nexus between the *purpose* of the police conduct and either ... the consent, or the evidence in issue,"[78] and, second, that Agent Hillin's headlong intrusion was "at worst a most minor and technical invasion of Sheppard's rights."[79]

The purpose of a fixed border patrol checkpoint, however, is *not* to "ascertain the citizenship" of those that roll through it.[80] That is a means, not an end: the Border Patrol is not the Census Bureau. The purpose of a border patrol checkpoint is "to secure [the] border with Mexico ... in order to regulate the inflow of aliens and contraband."[81] In other words, Agent Hillin's job is to catch illegal aliens, alien smugglers, drug smugglers, and drug

---

72. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).

73. *United States v. Robinson,* 625 F.2d 1211, 1220 (5th Cir.1980).

74. *Brown,* 95 S.Ct. at 2261–62.

75. *E.g., Robinson,* 625 F.2d 1211 at 1220.

76. *Sheppard,* 901 F.2d at 1231 & 1239 n. 3.

77. *Id.* at 1239 n. 3.

78. *Id.* at 1236 n. 11. (Emphasis added.)

79. *Id.* at 1235.

80. *Id.* at 1235 n. 9.

81. *United States v. Jackson,* 825 F.2d 853, 869 (5th Cir.1987) (Clark, C.J., concurring specially).

couriers.[82] When he pokes his head through the window to talk to travellers—even if we are naive enough to believe that he does so *only* to make eye contact, and not to smell the air in the vehicle or to steal glances at the vehicle's floor or under the dash or at the occupants' pockets—he is looking for something suspicious, because his job is to apprehend lawbreakers for deportation or prosecution. Thus, when Agent Hillin poked his head through the window to judge Pierre's "veracity or evasiveness," he was consciously looking for evidence of wrongdoing. When he smelled the marihuana, he'd found it. When he searched the luggage, which he testified he would have done regardless of Harris's consent, he found more. The nexus in this case is crystal clear.

▮ And while limited, Agent Hillin's search was also a flagrant violation of the Fourth Amendment. First, he had no reason, and he knew he had no reason, to suspect Harris, Pierre, or Turner of a violation of federal law. As we noted above, "[t]he intrusiveness of the search is not measured by its scope, but by the expectation of privacy upon which the search intrudes." [83] Second, this particular search was part of a systematic and continuing series of Fourth Amendment violations. To hold that the intrusion here was so "minor and technical" that it does not warrant suppressing the evidence would be to sanction the whole pattern of deliberate misconduct. "[A]ny incentive to avoid Fourth Amendment violations would be eviscerated." [84]

Furthermore, and again unlike *Sheppard,* the flagrancy of Agent Hillin's Fourth Amendment violation in this case was exacerbated by his disregard of settled Fourth Amendment principles in his search of the suitcase. The record demonstrates that Agent Hillin failed to solicit consent to search their luggage from either Pierre or

Turner, in spite of the fact that Harris specifically told him that some of the luggage belonged to them. At the time the search took place, the rule in this circuit was that a third party could validly consent to a search of another's property only when

the consenting party and the party claiming the fourth amendment violation mutually used the property searched and had joint access to and control of it for most purposes, so that it is reasonable to recognize that either user had the right to permit inspection of the property and that the complaining co-user had assumed the risk that the consenting party might permit the search.[85]

While the Supreme Court has subsequently broadened this by applying an apparent authority standard, even in apparent authority cases the searching officers must *"reasonably* (though erroneously) *believe* that the person who has consented to their" search had authority to do so.[86] There is no evidence in this record that Harris, Pierre, and Turner shared "joint access to and control of" *any* piece of luggage, so we cannot infer that Agent Hillin reasonably believed that Harris had authority to consent to a search of *every* piece of luggage in the vehicle. While we do not hold that Agent Hillin violated the Fourth Amendment in this respect—for we assume that Harris's consent was valid and voluntary—Agent Hillin's complete disregard for these settled Fourth Amendment principles adds, even if only incrementally, to the flagrancy of his violation in this case.

In sum, the Government failed to carry its burden of proving that the search of the suitcase was untainted by Agent Hillin's prior illegal search. We therefore hold that (1) Agent Hillin's intrusion was a Fourth Amendment search; (2) it was unreasonable, and (3) Harris's consent to the

---

**82.** *See id.* (exhibit of alien and drug seizures at Sierra Blanca in 1983–1985).

**83.** *United States v. Winsor,* 846 F.2d 1569, 1574 (9th Cir.1988) (en banc).

**84.** *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).

**85.** *United States v. Rizk,* 842 F.2d 111, 112–13 (5th Cir.1988) (per curiam).

**86.** *Illinois v. Rodriguez,* —— U.S. ——, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990).

subsequent search, though voluntary, did not attenuate the taint of Agent Hillin's illegal conduct. Harris's convictions must be reversed.

IV

SUFFICIENCY OF THE EVIDENCE AGAINST PIERRE

Terry Pierre withdrew his motion to suppress the cocaine before it was heard, and he does not challenge the legality of Agent Hillin's search on appeal. Pierre's only claim is that the Government adduced insufficient evidence at trial to sustain his convictions.

We review the sufficiency of the evidence supporting a criminal conviction to determine whether a reasonable jury could find the defendant guilty beyond a reasonable doubt.[87] We view the evidence most favorably to the Government, drawing all reasonable inferences and credibility choices in favor of supporting the jury's verdict.[88] Even so, the record must contain substantial evidence supporting the verdict.[89] "Juries must not be allowed to convict on mere suspicion and innuendo.... The test is whether the jury could 'reasonably, logically, and legally infer from the evidence presented that the appellant was guilty beyond a reasonable doubt.' "[90]

Stated most favorably to the Government, the case against Pierre boils down to the following facts:

(1) Pierre travelled in the GMC Jimmy from New Orleans to Los Angeles with Broadnax and Turner.

(2) Pierre and Harris spent time together out of Turner's presence while in Los Angeles.

(3) Pierre drove the GMC Jimmy most of the way from Los Angeles to Sierra Blanca.

(4) Agent Hillin discovered the suitcase containing 13.8 pounds of cocaine in the back of the GMC Jimmy.

(5) A search of Pierre's person incident to arrest turned up a baggie containing 0.4 grams of cocaine and a razor blade coated with cocaine residue.

(6) Pierre exhibited a "nonchalant, uncooperative demeanor" subsequent to his arrest.

There is no evidence in the record that Pierre was aware of the conversations at Don Tanner's house to which Harris testified.

A. *The Conspiracy Charge*

■ To convict Pierre of conspiracy under 21 U.S.C. § 846, the Government had to prove beyond a reasonable doubt the existence of an agreement between two or more persons to violate the narcotics laws.[91] The existence of a conspiracy need not be proved by direct evidence, but may be inferred from circumstantial evidence indicating a "concert of action" between the alleged conspirators.[92] We believe the evidence offered at trial was insufficient to establish the existence of a conspiracy.

■ The Government adduced no evidence that Harris and Pierre knew or knew of one another before they met in Los Angeles. The only connection shown at trial was that both men knew Calvin Broadnax. But the Government has never alleged and did not prove that Broadnax was a coconspirator—indeed, the Government specifically disavowed any such theory in its closing argument at trial. To find a conspiracy, therefore, we must find that a jury could be able reasonably to infer from the evidence that in the few days following

**87.** *E.g., United States v. Espinoza–Seanez,* 862 F.2d 526, 536 (5th Cir.1988).

**88.** *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Malatesta,* 590 F.2d 1379, 1382 (5th Cir.), *cert. denied sub nom. Bertolotti v. United States,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979).

**89.** *Malatesta,* 590 F.2d at 1382.

**90.** *United States v. Jackson,* 700 F.2d 181, 185 (5th Cir.) (quoting *United States v. White,* 569 F.2d 263, 268 (5th Cir.1978)), *cert. denied,* 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983).

**91.** *Espinoza–Seanez,* 862 F.2d at 536.

**92.** *Id.*

their meeting in Los Angeles, these two apparent strangers concocted and implemented a scheme to purchase (when the evidence establishes that both men were essentially penurious), transport, and distribute cocaine with a street value of $1.7 million with or without the participation of Broadnax. The evidence does not support that inference. Pierre's conspiracy conviction cannot stand.

### B. *The Possession Charge*

A much closer question is whether the Government adduced sufficient evidence to support Pierre's conviction for possession with intent to distribute. To convict Pierre, the Government was required to prove (1) knowing (2) possession (3) with intent to distribute.[93] We need address only the first of these.

 The knowledge element of a possession charge can rarely be established by direct evidence. "In the nature of things, proof that possession of contraband is knowing will usually depend on inference and circumstantial evidence."[94] Knowledge may be inferred from a number of circumstances, such as control over the vehicle in which the contraband is secreted or other evidence of a consciousness of guilt that might be "altogether inconclusive, if separately considered," but that "by their number and joint operation ... [are] sufficient to constitute" substantial evidence.[95]

 The Government argues that evidence of Pierre's "control" over the vehicle—that is, the fact that he drove it most of the way from Los Angeles to Sierra Blanca—together with other suspicious circumstances was sufficient. As one member of this panel succinctly put it, the general rule in this circuit is that "knowing

possession can be inferred from the defendant's control over the vehicle in which the illicit substance is contained if there exists other circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge."[96] For purposes of convenience, we will refer to this hereinafter as the "vehicle-control inference."

 While the jury might have inferred from the circumstances that Pierre knew that the suitcase was in the vehicle,[97] we do not believe that, under the facts of this case, a reasonable jury could infer knowledge that the *suitcase* contained cocaine from the fact that Pierre exercised "control" of the *vehicle*. The vehicle-control inference is an outgrowth of the doctrine of constructive possession.[98] That doctrine holds that the Government may prove the possession element of a possession charge by demonstrating "the knowing exercise of, or the knowing power or right to exercise, dominion and control over the proscribed substance."[99] "In essence, constructive possession is the ability to reduce an object to actual possession."[100]

Such proof establishes possession because it demonstrates "some nexus between the accused and the prohibited substance."[101] For the same reason, evidence of dominion and control may lead to an inference of knowledge. Because the defendant exercised, or had the right to exercise, dominion and control over the instrument in which the contraband was secreted, a "nexus between the accused and the prohibited substance" is established, making it reasonable to infer knowledge of the contraband. The cases applying the vehicle-control inference in this circuit have therefore been cases in which the contra-

---

**93.** *United States v. Anchondo–Sandoval,* 910 F.2d 1234, 1236 (5th Cir.1990).

**94.** *United States v. Richardson,* 848 F.2d 509, 514 (5th Cir.1988).

**95.** *Coggeshall v. United States (The Slavers),* 69 U.S. (2 Wall.) 383, 17 L.Ed. 911 (1865).

**96.** *Anchondo–Sandoval,* 910 F.2d at 1236.

**97.** *See* supra Part II.

**98.** *United States v. Richardson,* 848 F.2d 509, 512–13 (5th Cir.1988).

**99.** *United States v. Marx,* 635 F.2d 436, 440 (5th Cir.1981).

**100.** *United States v. Martinez,* 588 F.2d 495, 498 (5th Cir.1979).

**101.** *United States v. Ferg,* 504 F.2d 914, 917 (5th Cir.1974).

band was secreted *in the vehicle itself,* for example, in a modified gas tank, a false bottom in the trunk, or in a hollowed out spare tire.[102]

 This case is materially different. While Pierre may have exercised control over the vehicle, an issue on which we do not express an opinion, there is no evidence in the record that he had any right to exercise dominion or control *over the suitcase.* Had Pierre been the sole occupant of the vehicle, that fact alone might be sufficient circumstantial evidence that Pierre had such a right and the inference might be warranted. But Pierre was only one of three occupants, *all* of whom had their own luggage in the vehicle. Nothing found on Pierre, for example, keys to the suitcase,[103] and nothing found in the suitcase, for example, items belonging to Pierre,[104] indicated that he exercised either sole or joint dominion over the suitcase. In sum, the record contains no evidence of a "nexus" between Pierre and the suitcase except physical proximity. And as we have stated time and time again, "mere presence in the area where the narcotic is discovered or mere association with the person who does control the drug or the property where it is located is insufficient" to establish constructive possession.[105] By definition, therefore, mere proximity is also insufficient to justify an inference of knowledge.

 Unaided by the vehicle-control inference, the other circumstances cited by the Government are insufficient to justify finding beyond a reasonable doubt that Pierre "knowingly" possessed the cocaine. First, the Government invites us to view what it characterizes as Pierre's "uncooperative and nonchalant demeanor" following his arrest as evidence of a consciousness of guilt. This is an interesting tactic, for it is most often the case that the Government urges us to consider a defendant's *nervousness* as demonstrating consciousness of guilt.[106] We must refuse the invitation. No inference of guilt may be drawn from the fact that Pierre was "uncooperative," for the Fifth Amendment guarantees him the right not to cooperate.[107] Nor do we believe that Pierre's "nonchalance" can be considered demonstrative of a consciousness of guilt. The evidence at trial indicated that Pierre had been released from the Louisiana State Penitentiary at Angola only nine months prior to his arrest, having served more than fifteen at hard labor for armed robbery. For him, an arrest was hardly a devastating experience.

 The Government also cites the fact that Pierre was arrested with 0.4 grams of cocaine in his possession as evidence that he knew of the cocaine in the suitcase. The Government reasons that because the cocaine in the suitcase was 93% pure and the cocaine found on Pierre was 87% pure, whereas street cocaine usually approximates 30% purity, Pierre had to be dipping into the stash in the suitcase for his personal use. The Government supports this theory by noting that the suitcase was within Pierre's reach when he was riding in the back seat.

The Government's conclusion is not supported by the evidence. The Government introduced no evidence at trial that the integrity of the bundles in the suitcase had been breached in any way, or that any materials found in the vehicle could have been used to repair a breach if one had

---

**102.** *See, e.g., United States v. Diaz–Carreon,* 915 F.2d 951, 952–54 (5th Cir.1990); *United States v. Molina–Iguado,* 894 F.2d 1452, 1456–57 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 95, 112 L.Ed.2d 66 (1990); *United States v. Martinez–Mercado,* 888 F.2d 1484, 1486–87 (5th Cir.1989); *United States v. Romero–Reyna,* 867 F.2d 834, 835 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1818, 108 L.Ed.2d 948 (1990); *United States v. Olivier–Becerril,* 861 F.2d 424, 425 (5th Cir.1988); *Richardson,* 848 F.2d at 511–12.

**103.** *See Martinez,* 588 F.2d at 499.

**104.** *See Molina–Iguado,* 894 F.2d at 1456–57.

**105.** *Ferg,* 504 F.2d at 917 (quoting *United States v. Stephenson,* 474 F.2d 1353, 1355 (5th Cir. 1973)).

**106.** *E.g., Diaz–Carreon,* 915 F.2d at 954–55; *Molina–Iguado,* 894 F.2d at 1457; *Olivier–Becerril,* 861 F.2d at 427; *Richardson,* 848 F.2d at 513.

**107.** U.S. Const. amend. V; *see Miranda v. Arizona,* 384 U.S. 436, 460, 467–69, 86 S.Ct. 1602, 1620, 1624–25, 16 L.Ed.2d 694 (1966).

been made. To the contrary, the photographs introduced by the Government, which were taken immediately after the cocaine was seized, show six bundles, all carefully prepared and wrapped securely in cellophane tape: None appears to have been breached. Furthermore, the Government's own witness, Derrick Turner, testified that to his knowledge the only drug Pierre and Harris used during the trip from L.A. was marihuana. There is no evidence that they used cocaine, so there is no evidence that Pierre had any reason to dip into the stash during the trip.

Of course, there is the possibility, not raised by the Government either here or at trial, that Pierre had removed his personal sample from the cocaine in the suitcase before it was bundled and loaded into the vehicle. That, however, approaches sheer speculation. There is no evidence in the record linking Pierre to the cocaine before it was loaded into the vehicle, and the evidence that Pierre's sample was derived from the cocaine in the suitcase is equivocal at best. The Government cannot establish guilt beyond a reasonable doubt solely by "piling inference upon inference." [108] Pierre's possession conviction must be reversed.

For the foregoing reasons, the judgments of conviction against Otis Harris III are REVERSED and his case REMANDED to the district court for proceedings consistent with this opinion. The judgments of conviction against Terry Pierre are likewise REVERSED and the case REMANDED to the district court with instructions that it enter a judgment of acquittal.

---

108. *Anderson v. United States,* 417 U.S. 211, 224, 94 S.Ct. 2253, 2262, 41 L.Ed.2d 20 (1974).