IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 8, 2016

**STATE OF TENNESSEE v. TABORIS JONES**

**Appeal from the Circuit Court for Maury County**
**No. 24044    Robert L. Jones, Judge**

_____

**No. M2015-02515-CCA-R3-CD**

_____

Defendant, Taboris Jones, was convicted of possession with intent to sell more than 0.5 grams of cocaine within 1,000 feet of a school, and the trial court applied the Drug Free School Zone Act (the Act) to enhance Defendant's sentence. Defendant also pleaded guilty to simple possession of marijuana and improper display of registered license plate. The trial court imposed concurrent sentences of fifteen years for the cocaine charge, and ten days for simple possession of marijuana.  The trial court also imposed a $250.00 fine for the marijuana charge and a $5.00 fee for improper display of a license plate.   On appeal, Defendant argues that the evidence was insufficient to support his conviction for possession of more than 0.5 grams of cocaine with intent to sell within 1,000 feet of a school and that the Drug Free School Zone Act should not apply to his cocaine conviction.   After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

L. Samuel Patterson, Columbia, Tennessee, for the appellant, Taboris Jones.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Brent A. Cooper, District Attorney General; and Patrick Powell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

At approximately 8:30 p.m. on April 7, 2014, Officer Jason Lovett of the Spring Hill Police Department was traveling eastbound on West Seventeenth Street when he observed a black Chevrolet truck at the four-way stop of the intersection of West Seventeenth Street and Highland Avenue in Columbia. Officer Lovett noted that Highland Park Elementary was in the area of the intersection. The parties stipulated at trial that Highland Park Elementary School met the statutory definition of a school pursuant to the Drug Free School Zone Act. At the time, Officer Lovett was driving an unmarked unit and was assigned to the Maury County Drug Task Force. He had been investigating illegal narcotics since 2007.

Officer Lovett testified that the vehicle came to a complete stop at the intersection and turned right onto West Seventeenth Street which placed the truck in front of Officer Lovett. As Officer Lovett followed the truck, he noticed that there was no light illuminating the tag of the vehicle. Officer Lovett radioed Deputy Joey Parks, his "backup" officer, and initiated a traffic stop near the water tower across from a mobile home park. Officer Lovett approached the vehicle and asked the driver, identified as Defendant, for his driver's license, registration, and proof of insurance. Defendant gave Officer Lovett his driver's license, and Officer Lovett took the license back to his patrol car to check on its status, and he checked the status of Defendant's license plate. As Officer Lovett was checking the information, Deputy Parks walked up to Defendant's truck and asked him to step out of the vehicle. Defendant got out of his truck and stood in front of Officer Lovett's car with Deputy Parks. Officer Lovett heard Deputy Parks request consent to search Defendant truck, and Deputy Parks asked Defendant if there was anything illegal inside the vehicle. Officer Lovett testified that Defendant became "extremely irate." He said that Defendant began cursing and said that he was only pulled over because he was black.

When asked if Defendant consented to a search of his vehicle, Officer Lovett testified: "Not that I'm aware of. It just got so bad the way he was acting and stuff. To me, it was prolonging things." At that point, Officer Lovett ran his canine dog Abbi, who is a certified narcotics detection dog, around Defendant's truck. Abbi alerted on the driver's side door seam by scratching at the door. Officer Lovett placed Abbi back in his vehicle and informed Defendant that he was going to search Defendant's truck because the dog had detected a "narcotic odor" in the vehicle.

As Officer Lovett began searching Defendant's truck he heard Deputy Parks yell, "he's running." Officer Lovett began chasing Defendant and eventually lost sight of him near Chevy White's parking lot, and Officer Lovett stopped running. Deputy Parks had

returned to his vehicle and alerted other officers to be on the lookout for Defendant. He also drove around the area looking for Defendant. Officer Lovett returned to Defendant's truck and continued his search. Underneath the driver's seat, he found a green pill bottle and a digital scale with a white powdered residue on it. Officer Lovett also found a marijuana blunt in the ashtray.

When Officer Lovett returned to his office he field tested the white residue on the scale, and it was presumptively positive for "cocaine base." The pill bottle contained one bag of "powder," and there was a second bag in the bottom of the bottle that "had a little bit of crumbs stuck inside of it." Officer Lovett also field tested residue in the pill bottle, and it was positive for "cocaine base." He then sent everything but the digital scale by Lieutenant Doelle to the Tennessee Bureau of Investigation (TBI) Crime Lab for testing.

Officer Lovett was tendered and qualified as an expert in the field of narcotics investigation. He was familiar with the common quantity of cocaine sold and purchased in the area and that the commonly sold amount or used amount is "a 20," which is a "20 rock." Officer Lovett testified that a 20 rock usually costs twenty dollars and weighs approximately 0.1 grams. He said, "It's a very minute amount. It just gives them enough fix. It's a quick get [sic] is what it is."

Officer Lovett testified that in reference to charging an individual for possession of cocaine for sale, he looks for multiple baggies, digital scales, and currency. He also checks the individual's phone to see whom they have been talking to. Officer Lovett testified that with respect to a "user," he looks for pipes. He said, "I'm actually looking for pushers, char broil, which is actually an S.O.S. pad." Officer Lovett testified that he found nothing in Defendant's vehicle for the use of cocaine. However, Defendant had everything that he needed to sell cocaine such as the digital scales and what Officer Lovett estimated to be three grams of cocaine. He did not know if Defendant had currency on his person because Defendant ran. Officer Lovett had never known of a cocaine user carrying a digital scale. As to the marijuana blunt, Officer Lovett testified that he seized it and charged Defendant with simple possession. He noted that the blunt had been used because "[y]ou could still smell the burn. Not that it was smoked that night, but you could tell that it was burnt marijuana." It was his opinion that Defendant was more of a seller of cocaine rather than a user.

On cross-examination, Officer Lovett testified that during the chase there were no comments about shots fired, and he did not throw anything at Defendant. He said that he lost his flashlight out of his hand while running and kicked it and that it probably went toward Defendant. He later walked back to the area to look for the flashlight. Officer Lovett did not see Defendant throw anything. He said that Defendant turned himself in approximately two days after the chase. Officer Lovett noted that the amount of cocaine in the green bottle may have been worth nearly $500. Deputy Parks' testimony was

similar to that of Officer Lovett. He testified that Defendant said that he was upset because of an argument with his "significant other."

Special Agent Jennifer Sullivan of the TBI Crime Lab is a forensic scientist. She tested the substance submitted in the present case and determined that it was 3.03 grams of cocaine base.

William Doelle was a Lieutenant with the Maury County Sheriff's Office at the time of the offenses in this case. At the time of trial he was Director of the 22nd Judicial Drug Task Force. Director Doelle was tendered as an expert in the field of narcotics investigation. He testified that he took the evidence in the present case to the TBI Crime Lab and later picked it up. Director Doelle testified that he took some measurements near the Highland Park Elementary School. He testified:

> Distance, the 149 feet, was from - - there's a light pole here, an electric pole, here at the corner. This is 17th and Highland Avenue real close to the school right there. This is that corner, but this pole right here to the sign right here, this is the end of the school zone right here. This is, actually, Highland Park School. So from this sign that says "school zone" to there was 149 feet, according to the wheel that I used.

Director Doelle confirmed that the Google measurement for the same distance was 149.21 feet. He was aware of the location of the traffic stop in this case. Director Doelle testified that the distance from the corner of Highland Park Elementary School to the location of the traffic stop, past the mobile home park, based on Google Maps was 936 feet.

Director Doelle testified that he had handled more than one-thousand cases involving cocaine during his law-enforcement career. Based on his experience interviewing sellers and users of cocaine and conducting undercover drug buys, a person interested in purchasing cocaine for personal use does not commonly carry digital scales. Director Doelle testified that he looks at the amount of drugs, the packaging, and whether there is any drug paraphernalia to determine whether narcotic possession is for sale. He testified that users commonly have crack pipes, metal pipes, "char broil," pushrods, and numerous "Bic lighters." Director Doelle testified that sellers usually have scales and multiple bags.

Director Doelle testified that ninety percent of the crack cocaine sent to the crime lab "come[s] back with .1 grams on the weight on those rocks. So for every gram, you're getting ten rocks for every gram." He also said, "We paid $20 per rock to, you know, get .1 grams of crack cocaine." Director Doelle estimated that three grams of crack cocaine would produce "roughly 30 rocks." It was his opinion that a cocaine user would

- 4 -

not leave the amount of residue in the green bottle found in Defendant's truck. He said, "They're going to smoke every bit of that that there is to scrape out of that, someone that's on crack cocaine."

On cross-examination, Director Doelle testified that he did not know the exact spot that Defendant was stopped, and he did not physically go to the area of East Seventeenth Street and inspect the area of the stop and calculate the distance from the school property line. He consulted a website called the "Tennessee Property Data" to determine the property line of the Highland Park Elementary School. Director Doelle agreed that if a line was drawn from all of the parks, schools, libraries, and daycares in Columbia, there would be many overlapping drug free zones in Columbia. He agreed that not everyone who possessed cocaine in the drug free zones possessed it with intent to sell.

Director Doelle agreed that an individual who purchased three grams of cocaine at one time would get a better price than someone who purchased .1 gram at a time. He testified that three grams of cocaine at one time could possibly be purchased for $250 to $300. Director Doelle also agreed that a heavy crack cocaine user could use up to three grams of cocaine in a day to a day and a half. He acknowledged that not everyone with more than 0.5 grams of cocaine was selling it. On redirect examination, Director Doelle testified that in his experience, it was not common for someone to buy two to three grams of crack cocaine only for personal use.

Defendant testified that on April 7, 2014, he and his wife were renting a house in the Fox Run neighborhood on Kimberly Drive. He was employed by Southern Son's Paving Company. He also had a lawn care business. Approximately four months earlier, Defendant learned that he had a daughter who was nine years old. Defendant admitted that he was convicted of felony theft in 2007.

Defendant testified that he was driving his 2001 Chevrolet Silverado at the time of the stop on April 7, 2014. He explained he had been having problems with the truck prior to that night and that a couple of friends had been working on the vehicle for him. Defendant testified that he left the truck at Chris Sawyer's house a couple of weeks prior to April 7, 2014, and he also let other friends borrow his truck and trailer. He said that the vehicle usually sat in front of his house with the door unlocked. He thought that he owed approximately $800 on the vehicle. Defendant said that it had been a couple of weeks since he had driven the truck prior to being pulled over.

Defendant testified that his daughter called on April 7, 2014, and asked him to bring her some shoes. He waited for his wife to get home from work with the car because he did not want to drive the truck "at all." Defendant thought that his wife arrived home at approximately 7:00 p.m., and he said that she was "a little aggravated"

when she arrived home. He said that his wife began complaining because he used her car too often because his truck was "out of commission." Defendant testified that he got into his truck and left to take his daughter her shoes.

Defendant testified that he was pulled over by two officers in an SUV at approximately 8:00 to 9:00 p.m. after turning right on West Seventeenth Street. He did not see a second SUV. He said that Officer Lovett asked for his license, registration, and insurance. Defendant testified that he gave Officer Lovett his license and registration but he had left proof of insurance at home. He said that he did not know that his "tag light" was not working on the truck.

Defendant testified that he was sitting in the truck getting paperwork together when Deputy Parks "pops up on the passenger's side" of the truck. He said that he felt scared, and he got out of the vehicle and began talking to Deputy Parks and asking if he had done anything wrong. Defendant testified that he noticed that his driver's license was sitting on the windshield wiper of Officer Lovett's SUV but he did not see Officer Lovett. He said that Deputy Parks was not answering his questions. Defendant further testified:

> Then he starts to explain to me we're vice, where are the guns at, we're vice, where are those guns at. He just kept on repeating that to me, where are those guns at. So I'm thinking to myself like why is he continuing to ask me about guns.

Defendant said that it was bothering him because Deputy Parks would not make eye contact with him and that Deputy Parks was asking him about "guns and stuff." Defendant then asked Deputy Parks if he was racist, and "when I said that, he got out of control." Defendant explained that Deputy Parks "was being demanding" which caused Defendant to feel "belittled."

Defendant testified that he then noticed the back door open up on the SUV, and "a dog coming out of the car." He said that Deputy Parks asked to search Defendant and his truck. Defendant testified that he agreed to let Deputy Parks search his person, and the officer pulled a receipt out of Defendant's pocket. Defendant did not have any drugs or weapons on his person. Defendant testified that he knew that there were two "marijuana roaches" in the ashtray of his truck. He said that he did not give the offices consent to search his truck.

Defendant testified that Deputy Parks told him that if the dog gave an alert, probable cause would exist to search Defendant's vehicle. Defendant said that he observed the dog run around his truck three times without alerting on the vehicle. After the dog finished its task, Officer Lovett placed the dog back in the SUV. Defendant

testified that he then asked, [N]ow, can I get my ticket, take my daughter her things, so I can get ready for work in the morning?"

Defendant testified that he noticed that Officer Lovett was putting "gloves on or something," and Deputy Parks was looking at the ground. Defendant testified that at that point, Officer Lovett began searching his truck, and when Defendant said something about it, Deputy Parks said, "if you didn't ask me if I was a racist, I wouldn't be doing this to you." Defendant testified: "I looked, I said, I can see now that you-all are with [sic] something tonight and I ran for my life." Defendant described the direction that he ran and noted that he took action to avoid being tasered. He also said that one of the officers grabbed his jacket as he jumped over a fence. Defendant testified that Deputy parks threw a lighter at him and said that shots had been fired. He said that he noticed an opening in the fence behind "Chevy White's," and he circled back around to the street where his truck was parked. He said that the truck was sitting there with the door open, and no police cars were around. Defendant said that he ran from the officers because he was "sincerely scared." He denied knowing that the scales or cocaine were in the truck or how they got there. Defendant turned himself in to the Maury County Sheriff's Department two days later.

On cross-examination, Defendant admitted that the area where he was stopped is nowhere near Theta Park, the area where he was supposed to be taking shoes to his daughter. Defendant admitted that he drove beside Highland Park Elementary School when he drove to the corner of Highland Avenue and West Seventeenth Street, which was well within 1,000 feet of the school zone. Defendant testified that the cocaine found in the truck did not belong to him, and he did not use crack cocaine.

Defendant testified that he did not hear officers tell him to stop or say anything else as he ran away. He said that he was not worried about the marijuana in his truck because it "was just two ends of the blunt, and there's no marijuana in it."

*Analysis*

Defendant argues that the evidence was insufficient to support his conviction for possession of more than 0.5 grams of cocaine with intent to sell within 1,000 feet of a school. More specifically, Defendant argues that the State did not prove that he "knowingly possessed cocaine nor was the cocaine for resale."

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions

concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences drawn therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

To sustain a conviction for possession with intent to sell 0.5 grams or more of cocaine within 1,000 feet of a school, the State must prove beyond a reasonable doubt that appellant knowingly "[p]ossess[ed] a controlled substance with intent to . . . sell the controlled substance." Tenn. Code Ann. § 39-17-417(a)(4). In that regard, possession of cocaine "is a Class B felony if the amount involved is point five (.5) grams or more." Tenn. Code Ann. § 39-17-417(b)(1). However, when a defendant possesses cocaine with intent to sell 0.5 grams or more "on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private . . . secondary school, . . . [the defendant] shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation." Tenn. Code Ann. § 39-17-432(b)(1). Possession of a controlled substance may be actual or constructive. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). A person constructively possesses a drug when the person has both the power and intention to exercise dominion and control over the drugs either directly or indirectly through others. *See State v. Patterson*, 966 S.W.2d 435, 444-45 (Tenn. Crim. App. 1997). "One's mere presence in an area where drugs are discovered, or one's mere association with a person who is in possession of drugs, is not alone sufficient to support a finding of constructive possession." *Shaw*, 37 S.W.3d at 903. "Proof that a possession is knowing will usually depend on inference and circumstantial evidence. Knowledge may be inferred from control over the vehicle in which the contraband is secreted." *State v. Brown*, 915 S.W.2d 3, 7 (Tenn. Crim. App. 1995) (internal citations omitted) (citing *United. States v. Pierre*, 932 F.2d 377, 392 (5th Cir. 1991)).

Viewed in a light most favorable to the State, the proof shows that Officer Lovett pulled Defendant over on April 7, 2014, because the license plate light on Defendant's truck was not working. The stop occurred approximately 936 feet from the Highland Park Elementary School. When Deputy Parks, who had also arrived on the scene, requested consent to search Defendant's truck, and when he asked Defendant if there was anything illegal inside the vehicle, Defendant became "extremely irate." When Officer Lovett ran his narcotics detection canine around Defendant's truck, the dog alerted on the

driver's side door seam by scratching at the door. Defendant then ran as Officer Lovett began searching Defendant's truck, and the officers eventually lost sight of him. Officer Lovett searched Defendant's truck and found a green pill bottle that contained 3.03 grams of cocaine, a digital scale with cocaine residue, and a marijuana blunt in the ashtray. Officer Lovett, an expert in narcotics investigation, testified that Defendant had everything needed to sell cocaine, other than currency, in the vehicle, and there was nothing that indicated Defendant was using the cocaine. He did not know if Defendant had any currency because Defendant ran away before he was searched. It was Officer Lovett's opinion that Defendant was more of a cocaine seller than a user.

Director Doelle also testified as an expert in the field of narcotics investigation. He said that cocaine users commonly have crack pipes, metal pipes, "char broil," pushrods, and numerous "Bic lighters." Director Doelle testified that sellers usually have scales and multiple bags. He further explained that thirty rocks of cocaine could be made from the amount of cocaine found in Defendant's truck.

The jury, as was its prerogative, rejected the Defendant's claim that he did not know that the cocaine and scales were in his truck. This Court will not second-guess the factual determinations of the jury. The evidence was sufficient to support Defendant's conviction for possession of more than 0.5 grams of cocaine for resale within 1,000 feet of a school. Accordingly, the Defendant is not entitled to relief on this issue.

Defendant also argues that:

> [T]he enhanced criminal penalty found in Tennessee Code Annotated § 39-17-432 do[es] not apply to the offense of Possession of Cocaine with Intent to Resale [sic] found in Tennessee Code Annotated § 39-17-417 unless the State proves that the Defendant intended to sale [sic] the cocaine within the drug free zone.

Defendant acknowledges that this court has held that the Drug Free School Zone Act does not create a new offense but imposes enhanced punishment for a drug offense committed within a drug free school zone, and therefore, does not require a specific mens rea to conclude that a defendant violated the act. *See State v. Armard Reeves*, No. W2012-02656-CCA-R3-CD, 2014 WL 1593153 (Tenn. Crim. App. April 17, 2014). He also acknowledges that this court has upheld a conviction under the Act when a defendant was merely traveling through a school zone while in possession of a controlled substance, even if arrested elsewhere. *See State v. Alejandro Neave Vasquez and Nazario Araguz*, No. M2010-02538-CCA-R3-CD, 2012 WL 5989875 (Tenn. Crim. App. Nov. 28, 2012).

Defendant requests that we review our "prior decisions and find that Possession of Cocaine for Resale [sic] does not fall within the increased punishment requirement of

Tennessee Code Annotated § 39-17-432 unless the State shows that the Defendant intended to sell the cocaine within the drug free zone. . ."

We decline Defendant's request as this would defeat the purpose of the Act. In *State v. Smith*, 48 S.W.3d 159 (Tenn. Crim. App. 2000) this Court held:

> This court in *Jenkins*, 15 S.W.3d at 916-18, in addressing the defendant's claim that the Drug-Free School Zone Act "is unconstitutionally vague and violative of due process because it lacks an explicit mens rea requirement," acknowledged two potential interpretations of the Act. We observed that, *if* the legislature only intended the Act to enhance penalties for violations of the Drug Control Act, the Act is not subject to Tenn. Code Ann. § 39-11-301 and does not require a mens rea. *Id.* at 917-18. *Cf. People v. Pacheco*, 281 Ill. App. 3d 179, 216 Ill. Dec. 920, 666 N.E.2d 370, 375-376 (1996). Alternatively, we observed that, if the legislature intended the Act to create a separate offense, the Act *is* subject to Tenn. Code Ann. § 39-11-301 and requires, at a minimum, a mens rea of recklessness. *Id.* We opined that the Act survives constitutional scrutiny under either interpretation. *Id.* We did not, however, address whether the Act was clearly and unambiguously susceptible to one interpretation. We now conclude that the legislature's intent to enact an "enhancement statute" is unmistakable both from the plain language of the Act and from the Act's legislative history.

*Smith*, 48 S.W.3d at 167-68.

Because the Drug Free School Zone Act does not require a specific mens rea, the State is not required to show that the Defendant knowingly possessed the cocaine with intent to sell the cocaine within 1,000 feet of a school. Defendant is not entitled to relief on this issue.

## CONCLUSION

Having carefully reviewed the record before us and the briefs of all the parties, we find no error and affirm the judgments of the trial court.

THOMAS T. WOODALL, PRESIDING JUDGE